[Civ. No. 9394.   Third Dist.   Mar. 12, 1959.]

DIEBOLD, INCORPORATED (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION, Respondent.

Gilford G. Rowland and George E. Paras for Appellant.

Stanley Mosk and Edmund G. Brown, Attorneys General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman and Edward P. Hollingshead, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—This is an appeal by Diebold, Incorporated, from an adverse judgment in an action brought to recover sales taxes paid under protest.

The trial court made findings as follows: Diebold is an Ohio corporation authorized to do business in California. Its main office and manufacturing plant is located in Canton, Ohio. Its business consists of manufacturing and selling fire and burglar resistive safes and chests, bank vaults and bank equipment, storage files, microfilm equipment and hollow metal doors and frames. It has organized its operations into various divisions, including the systems division, the service division and the bank division. The bank division is primarily concerned with the manufacture and sale of vaults and other equipment to banks. Diebold does not maintain an inventory

of products sold through the bank division in this state. The equipment sold through the bank division is custom built to order. Except in exceptional circumstances, the equipment supplied through the bank division is shipped by Diebold directly to the customer under a straight bill of lading. On rare occasions it is necessary to send the equipment to the branch office of Diebold for delivery to the customer. The freight charges on all of the shipments of equipment here involved were prepaid by Diebold. The bank division maintains a permanent office and place of business in California, through which it channels its sales to California banks in order to obtain the benefits of a local business. The sales of Diebold products made through its bank division to California banks are solicited by salesmen employed in this state by the bank division. On occasion employees of other divisions of Diebold are paid a portion of the commission on the sale for providing tips to the bank division salesmen. The California salesmen, after receiving the orders from the California banks, transmit these orders for products sold through the bank division to Canton, Ohio, for approval or rejection by general officers of Diebold there. Acceptance or rejection must take place at Canton, Ohio. No employee of Diebold in California has any authority whatever to accept or reject a contract. After the order is placed by the customer, the employees at the California office of Diebold are available to answer queries from customers with respect to changes in plans or delays in delivery. Each of the orders for equipment involved in this litigation was solicited in California by employees of the bank division located at the offices of that division in this state. Such sales were channeled through the offices of Diebold in this state. Diebold maintains a complete shop in Los Angeles, California, which handles the installation of items sold through the bank division. This shop also services equipment sold by Diebold. In the solicitation of orders, Diebold makes its customers aware of the availability of the shop in this state as a sales inducement. Having a local shop in California for the installation and servicing of equipment is helpful to Diebold in obtaining orders from banks in this state. With respect to contracts for bank division products calling for installation by Diebold, the work of installation is performed by employees of the service division of Diebold in this state as part of the fulfillment of the sales contract. Other contracts provide that installation will be done by the bank itself and other contracts are silent on the matter of installation. It is only

with respect to the contracts which provide for installation by Diebold that the service division performs such installation. Service policies and warranties on the bank division products are carried out by employees in the service division of Diebold in this state. Contracts for the continued servicing by the service division of Diebold of products sold by Diebold may be entered into by purchasers from Diebold. These service contracts are independent of the contracts of sale. Diebold retained title to the items of equipment here involved until after the items were delivered to the purchaser in California and were fully paid for by the purchaser in this state. The purchasers of items of equipment here involved did not obtain actual possession or the right to possession of such items until after the items were delivered to the purchasers in California.

■ Diebold's first contention on appeal is that the transactions described in the court's findings were immune from taxation under the commerce clause of the federal Constitution.

It is apparent from the form of the findings made that in rejecting the claim of immunity the trial court relied heavily upon the decision of the United States Supreme Court in the case of *Norton Co.* v. *Department of Revenue of the State of Illinois,* 340 U.S. 534 [71 S.Ct. 377, 95 L.Ed. 517]. In that case a Massachusetts corporation maintained in Illinois a branch office and warehouse which, in addition to over-the-counter sales, received orders which were forwarded to the home office for acceptance, acted as intermediary in distributing products from the home office in carload lots so as to reduce freight rates, serviced machines after sale and stood ready to receive complaints and to give engineering and technical advice. Illinois, in imposing a retailer's occupation tax on the corporation, based it on gross receipts from all sales to Illinois customers. The Supreme Court held that the Illinois courts were warranted in holding that the corporation had not established that such services as were rendered by its local office were not decisive factors in establishing and holding the Illinois market; that while a concern does not, by engaging in business within a state, lose its right to do interstate business with tax immunity, it cannot channel business through a local outlet to gain the advantage of a local business and also hold the immunities of an interstate business. Said the court, at page 521 [95 L.Ed.] :

"This corporation has so mingled taxable business with that which it contends is not taxable that it requires adminis-

trative and judicial judgment to separate the two. We conclude that, in the light of all the evidence, the judgment attributing to the Chicago branch income from all sales that utilized it either in receiving the orders or distributing the goods was within the realm of permissible judgment. Petitioner has not established that such services as were rendered by the Chicago office were not decisive factors in establishing and holding this market. On this record, no other source of the customer relationship is shown.

"This corporation could have approached the Illinois market through solicitors only and it would have been entitled to the immunity of interstate commerce as set out in the Dilworth case. [*McLeod* v. *Dilworth*, 322 U.S. 327 (64 S.Ct. 1023, 88 L.Ed. 1304).] But, from a competitive point of view, that system has disadvantages. The trade may view the seller as remote and inaccessible. He cannot be reached with process of local courts for breach of contract, or for service if the goods are defective or in need of replacement. Petitioner elected to localize itself in the Illinois market with the advantages of a retail outlet in the State, to keep close to the trade, to supply locally many items and take orders for others, and to reduce freight costs to local consumers. Although the concern does not, by engaging in business within the State, lose its right to do interstate business with tax immunity [citing case] it cannot channel business through a local outlet to gain the advantage of a local business and also hold the immunities of an interstate business."

On this subject of immunity we think little more need be said beyond saying that the findings of the trial court in the instant case come squarely within the rule laid down in the Norton case and that on the authority of that case the transactions here involved cannot escape taxation under the immunity clause. This is said, of course, upon the assumption that, so far as material to the claim of immunity, the findings made are supported by the record. Diebold claims that certain vital findings are unsupported. We will next discuss these contentions.

Diebold challenges the finding that its bank division maintains a permanent office and place of business in California through which it channels its sales to California banks in order to obtain the benefits of a local business. There is evidence that employees in the bank division occupy office space in the branch offices of Diebold operated by the systems division in San Francisco and Los Angeles. At these offices

the bank division employees receive secretarial and telephone service and mail, including orders and other communications from customers, as well as interoffice communications from Canton. These interoffice communications frequently refer to "The Los Angeles Branch" or "The San Francisco Branch." These facilities enjoyed by the employees of the bank division were shown to be as permanent and sufficient for the bank division's purposes in doing business in California as that business required for its efficient conduct. The circumstance that the bank division was required to compensate the systems division for the office space, telephone, secretarial and mail services, which requirements were met by bookkeeping entry, does not deprive the court's finding that Diebold maintained for its bank division a permanent office and place of business in California of necessary support. It is unlikely that customers doing business with Diebold, meeting its bank division salesmen at these offices maintained under the name of Diebold, were impressed at all that they were not doing business directly with appellant. It was shown that in soliciting sales Diebold's bank division salesmen emphasized to customers the fact that installation and servicing of Diebold's products could and would be performed by Diebold employees (not bank division employees) and that the company had a complete shop in Los Angeles for this purpose. We think it sufficiently appears not only that Diebold had for its bank division's use permanent office, shop and service facilities in the state but that its solicitation of business by its bank division emphasized to its bank customers that these matters constituted reasons why it was better to do business with Diebold than with its competitors in that special field. Diebold's bank division employees were not itinerant "drummers." They worked out of permanent offices maintained by Diebold. They received and sent mail to customers and prospective customers from those offices. They continued in and from those offices to maintain close contact with customers who had ordered equipment made for their special uses. The trial court's findings that through those offices Diebold channeled its California sales made by its bank division aptly describes what was taking place. Diebold lays great emphasis upon the departmentalization of its business but we think the trial court could and did conclude that under its methods of doing business in California its competitive capacity was little, if at all, lessened by its departmentalization from what it would have been had it forthrightly maintained branch offices without.

regard to departmentalization. We think the trial court could well doubt that Diebold's bank division customers were aware of that departmentalization as having any effect on business done with Diebold. It does not appear that any of the equipment sales here involved were not solicited by California employees of the bank division located in and working out of the local offices of Diebold. It appears to us and we think it appeared to the trial court that so far as Diebold's sales of bank equipment were concerned, so far as its competitors in that line were concerned, and so far as its customers and prospective customers in that line were concerned, Diebold was doing business under conditions just as local and just as favorable to it as if it had been a California corporation doing business solely in this state.

■ Diebold challenges the finding that it maintains a complete shop in Los Angeles which handles the installation of items sold through its bank division, services equipment sold by Diebold, makes its customers aware of the availability of its shop in this state as a sales inducement and that the presence in California of this local shop for installation and servicing of equipment has been helpful to Diebold in obtaining business for its bank division. Diebold's form contracts which its bank division salesmen used provided a space for requirement of installation by Diebold if the customer wanted it and a number of the contracts in evidence show that installation was contracted for. When so required the service division did the work. On many other occasions it was done under a separate contract but that fact is not decisive in determining the question of immunity. There is in evidence a letter written by Mr. F. B. Schneider, the regional manager of the bank division located at Los Angeles, saying to a prospective bank customer: "We wish to call your attention to the fact that we are the only major vault company that maintains a complete shop in Los Angeles. All the installation work will be done by our own men, and in this way you will not have any divided responsibility in installing this equipment."

Without going further, we hold that from this record the findings of the trial court are supported and that, therefore, as we have heretofore said on the authority of the Norton case, the transactions here involved were not immune from taxation under the commerce clause.

The next contention of Diebold is that the sales were not made in California and therefore that they are not taxable transactions. Diebold holds a retail sales license in this state

and it appears in the record that it has paid and collected sales taxes on a great portion of its business although it contends that the transactions here involved are not so taxable. Diebold placed in evidence its order files with respect to each of the transactions here involved. These files were received for the purpose of showing its business procedure in connection with its bank division sales. Generally the sales were evidenced by either a written contract executed by both parties or by such as customer orders and Diebold acceptances. The contracts provided for progress payments. The order files show that full payment was not made until after the goods arrived in California. Section 6006 of the Revenue and Taxation Code provides as follows:

" 'Sale' means and includes:

"(a) Any transfer of title or possession, . . . in any manner or by any means whatsoever, of tangible personal property for a consideration. . . .

. . . . . . . . . . . . . .

"(e) A transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price."

The trial court found that Diebold retained title to the items of equipment here involved until after those items were delivered to the purchaser in California and until the price was fully paid by the purchaser which payments were made in this state; that the purchasers did not obtain actual possession or the right to possession of such items until after the items were delivered to the purchasers in California. Obviously, these findings, if supported, establish that the sales occurred in California and were taxable. Diebold contends the findings lack support.

A seller may reserve both the property in goods and the right to possession thereof even after delivery to the buyer if it is specifically provided in the contract that he may. (Civ. Code, § 1740, subd. (1).) The section referred to reads:

"(1) Where there is a contract to sell specific goods or where goods are subsequently appropriated to the contract, the seller may, by the terms of the contract or appropriation, reserve the right of possession or property in the goods until certain conditions have been fulfilled. The right of possession or property may be thus reserved notwithstanding the delivery of the goods to the buyer or to a carrier or other bailee for the purpose of transmission to the buyer."

█ As we have stated, two types of contract were used.

We will discuss first the type referred to by the parties as the "Diebold Bank Division Agreements" which designation we will shorten to "bank agreements." In material part these agreements provided that the purchaser agreed to buy and the contractor agreed to furnish to the purchaser certain described work and materials; that the contractor was to furnish material only or (in some cases) was to furnish and install; that terms were net f.o.b., Canton, Ohio, freight allowed to destination; that the purchaser agreed to pay for the work and materials in the following manner: 25 per cent 30 days from the date of the contract; 25 per cent 60 days from date of the contract; 25 per cent when work was shipped; and 25 per cent upon completion of the contract. There then appeared an integration clause. Finally it was provided "All materials shall remain the property of said Contractor until fully paid for." It was shown that the final payment was always made after the goods were delivered to the purchasers in California. Since the bank division agreements provided that title should not pass until the goods were paid for, and since, in the performance of the contract the goods were to be shipped to California, and since the proof showed that the final payments were made after the goods reached California, the court's finding that title passed in California and the conclusion that therefore the transactions were taxable are fully supported by the record. Nevertheless, Diebold argues that before the goods left for California there was a transfer of the right of possession of the goods prior to the time they were delivered in this state. The claim is that the provision for reservation of title is a mere security provision, that the contract is a conditional contract of sale, and that there was a transfer of the right to possession before the goods left Ohio, occurring when the goods were shipped under a straight bill of lading; naming the purchaser as consignee. But this argument must fail before the clear terms of the instruments. The documents say nothing of credit. On the contrary, they call for three advance payments, 25 per cent 30 days from date of contract, 25 per cent 60 days from said date, 25 per cent when goods are shipped. The final payments were due on "completion of contract" which means completion by Diebold, i.e., delivery. What procedure was followed by Diebold in shipping and delivery, other than as specified in the writings, could not change the contracts. The reservation of title until the goods were paid for (and that last act, in all cases, oc-

curred in California) was in no sense the reservation of a mere security title. The transactions carried on by means of the bank agreements were all taxable.

We will next discuss Diebold's contentions that sales made through the medium of purchase orders and Diebold acceptances constituted transactions nontaxable because title and/or possession were transferred before the goods left Ohio. Of the 51 transactions under review 17 fall in the classification now under discussion. The rest were bank agreement transactions. Sometimes the order files in evidence contain only the purchaser's orders; but the acceptances, if written acceptances were executed by Diebold, do not appear. The files contain in every instance numerous documents, many of which are interoffice communications and correspondence with the purchaser during the course of manufacture and delivery. Sometimes the purchase orders bear, stamped upon the face, statements, such as one which specified "that title to the merchandise shall pass to buyer when the merchandise is delivered by seller to the common carrier and consigned to buyer." There were three transactions in which this statement appeared on the face of the order. One order had stamped upon it the statement: "As a part of the fulfillment of this contract, it is understood that the property purchased is to be shipped to the Security-First National Bank of Los Angeles, from a point outside the State of California, and that no State of California sales or use tax is to be added to the cost thereof." Four orders had stamped upon the face of each the following: "The goods hereby ordered are to be shipped from a point outside of the State of California, directly to the purchaser in interstate commerce and without side markings." Three of the orders bore the following: "Shipment hereunder will be made from outside the State of California." One order was placed by the customer by telephonic communication and acknowledged by Diebold by letter. The telephoning of the order was done in California to a salesman operating in the San Francisco area.

First, as to the three contracts wherein the order specified that title to the merchandise should pass when the merchandise was delivered by the seller to a common carrier consigned to the buyer, we find the proof to be that shipment was made from Canton, by common carrier under straight bill of lading showing Diebold as consignor and the purchaser as consignee. Since it is competent for the parties to a sales transaction to stipulate as to the time and place where title is

to pass, these three transactions were nontaxable. Pursuant to the express agreement of the parties, title passed in Ohio when the goods were delivered to the carrier.

Turning our attention now to the 14 transactions not heretofore discussed, we find that the contracts involved are in 13 instances evidenced by purchase orders issued by the banks with written acknowledgments thereof by Diebold. As to one, the evidence shows an oral order from the purchasing bank telephoned to a Diebold salesman and acknowledged by Diebold in writing. There is nothing in the orders and the acceptances which expressly declares the intention of the parties in respect of the passage of title. Since the prime object of a sale or a contract to sell is the transfer of title, this essential element must therefore be ascertained by construction. Pursuant to recognized rules the contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if this can be done without violating the intention of the parties. (Civ. Code, §§ 1643, 3541; see Rest., Contracts, § 236 (a).)

When language employed is fairly susceptible of either one of two constructions contended for, extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties. A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Also for this purpose conversations between and declarations of the parties during the negotiations before the execution of the contract may be shown. (Civ. Code, § 1647; Code Civ. Proc., § 1860; *Walsh* v. *Walsh,* 18 Cal.2d 439, 444 [116 P.2d 62]; Restatement, Contracts, § 235 (d).) Furthermore, a construction given the contract by the acts and conduct of the parties with knowledge of its terms before any controversy has arisen as to its meaning is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. (*Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17].) Where there is a contract to sell unascertained goods, no property in the goods is transferred to the buyer unless and until the goods are ascertained. (Civ. Code, § 1737.) Where there is a contract to sell specific or ascertained goods the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. For the purpose of ascertaining the intention of the parties regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circum-

stances of the case. In the transactions here under review, we think it clear we are dealing with contracts to sell goods not ascertained when the contracts were made, but which were ascertained when the goods were manufactured to order. Section 1739 of the Civil Code contains statutory rules for ascertaining intention and the section begins by declaring that:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer."

Having regard to the stated terms of the contracts here involved does not lead us to a clear ascertainment of the intention of the parties and we thus pass on to proof of conduct, usages and circumstances. The court had before it testimonial proof that in all the transactions involved the goods were shipped by Diebold from Canton by common carrier to the purchasing bank in California and that Diebold prepaid the freight. Many of the orders contained the term "f.o.b. Canton, Ohio," but the trial court could conclude from the record this was a mere pricing term. The trial court could conclude that the contract to sell required Diebold to deliver the goods to the buyer at a particular place in California and to pay the cost of transportation. The transactions therefore come within Civil Code, section 1739, rule 5, which reads:

"If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

In view of what has been said and of the rule that the burden of proof lies upon the taxpayer to prove that the transaction is not taxable, the presumption being that it is, we hold that the trial court's determination as to the passage of title in California, save with regard to the three transactions wherein it was expressly agreed otherwise, is supported by the record.

Diebold contends that the trial court committed reversible error by limiting the evidential effect of its order files which it offered for all purposes, and which the court admitted for the purpose only of showing Diebold's procedures in fulfilling its contracts. These order files contained many documents, a great proportion of which had no probative value upon any contested issue, especially that of title transfer.

Respondent objected to the receipt of the order files on the grounds of relevancy, arguing that the files were inadmissible until and unless Diebold stripped them of irrelevant matter. The court, contrary to respondent's contentions, appears, however, to have overruled the relevancy objection in the form made. It was competent for the court to do so, although it might have insisted that the files be rid of irrelevant matter before being received. The order files are now before us, compelling us in order to treat appellant's contentions as to limitation of proof to laboriously examine all of them. Most of the material matter contained in those files is in reality a duplication of the testimony of the witness Crawford, vice-president of Diebold in charge of the bank division, who testified concerning their contents upon exhibition to him of the writings. Thus he testified to the form and content of the bill of lading used by Diebold in shipping the goods; he testified to the form and content of the invoices used by Diebold when the goods were shipped; he testified as to the matters stamped upon the face of the various orders as hereinbefore related; he testified concerning shipping orders contained in a few files; Crawford also testified that when goods had been delivered to the carrier for shipment, the bill of lading, Diebold's invoice, and the written form, admitted in evidence, and designated as Diebold Form 1290, were all forwarded by mail to the purchaser, arriving in the usual course of business 10 days to 2 weeks ahead of the goods. This Form 1290 told the purchaser that the attached bill of lading was an acknowledgment by the carrier of the shipment of the goods in good condition; that Diebold's responsibility for the shipment had ceased upon such delivery of the goods to the carrier; that if goods were damaged or were short in quantity on arrival complaint must be made by the customer to the carrier or such claims of shortage or damage could not be allowed by the carrier. Diebold asserted its willingness to assist the purchaser in collecting claims for loss or damage without Diebold being thus made responsible therefor. Finally the form told the customer that claims for loss or damage could not be deducted from Diebold's invoice. The trial court in its memorandum of decision stated that it had received the offered files for the limited purpose of showing the Diebold procedures in fulfilling the orders but was rejecting the files on the issue of intent as to time of transfer. We think the court erred in so limiting those portions of the files which were relevant on that issue. We cannot,

however, agree with Diebold's argument that the error was in anywise prejudicial. The proof of matters important and relevant to the determination of the issue of transfer, as we have said, in all essentials appears in the record without reference to the files. We hold that the trial court's findings on the question of when title passed in all of the order transactions, save three, are supported by the record.

For the reasons given, the judgment appealed from is affirmed except as to the three transactions wherein the parties expressly stipulated that title to the goods should pass when they were placed on board a common carrier in Canton. As to those transactions the trial court is directed to adjudge the recovery by appellant of the taxes paid. Respondent to recover costs.

Peek, J., and Schottky, J., concurred.