[Civ. No. 24668. Second Dist., Div. One. May 22, 1961.]

THE FRITO COMPANY, WESTERN DIVISION (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION, Respondent.

Hill, Farrer & Burrill, Carl A. Stutsman, Jr., Donald H. Keltner and Leon S. Angvire for Appellant.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Joe J. Yasaki, Deputy Attorney General, for Respondent.

WOOD, P. J.—This is an action to recover sales taxes which were paid under the Sales and Use Tax Law. Plaintiff appeals from the judgment, which was in favor of defendant.

Appellant contends in effect that the evidence does not support the finding that it was the retail seller or seller of the truck referred to herein.

The plaintiff and defendant made a ''Joint Pre-trial Statement'' of facts. They also stipulated that additional evidence might be offered at the trial. The joint pretrial statement was made a part of the pretrial order. The case was submitted upon that statement and order, and upon additional evidence presented at the trial.

The joint pretrial statement, as to facts which were agreed upon, was as follows:

''1. The plaintiff is and was at all times a duly organized and existing California corporation with its principal place of business in the County of Los Angeles. The plaintiff was engaged in the manufacture and sale of food products for resale.

''2. The defendant, State Board of Equalization, is an agency of . . . the State of California . . . and is charged with the duty of administering the sales and use tax laws of the State of California.

''3. During the period in question, July 1, 1950, to December 31, 1955, the plaintiff filed consumer use tax returns reporting and paying taxes on the purchase price of certain tangible personal property purchased for storage, use, or other consumption in California. The proper reporting of this use tax is not involved in the pending litigation.

''4. On or about June 27, 1956, a notice of determination of deficiency, interest and penalties of California sales taxes was sent to plaintiff. Thereafter sales taxes in the amount of $7,905.18, interest thereon in the amount of $1,137.18, and a penalty in the amount of $795.29, a total of $9,837.65, was paid by plaintiff on or about July 18, 1956.

''5. On or about October 12, 1956, a claim for refund for such tax, interest and penalties was filed by plaintiff with the defendant, and subsequently, by letter dated May 2, 1958, such refund was denied by defendant. No part of the amount claimed has been paid.

"6. The aforesaid determination of sales tax deficiencies, to the extent involved in this action, was made by the defendant on the assumption that plaintiff was a retailer of used delivery trucks, and thus subject to California sales taxes in that alleged capacity.

"7. The plaintiff, during all of the period involved herein, employed salesmen to merchandise its food products to retail food stores on a commission basis. For purposes of income tax, withholding and social security taxes, these salesmen were considered to be employees.

"8. A salesman employed by the company is required to furnish a delivery truck for transportation of the food products to the stores.

"9. Frito Company recommends the type and makes of trucks which may be used by its salesmen. In order for a salesman to use a delivery truck other than a make or type recommended by Frito Company, clearance must first be obtained from Frito Company's sales manager.

"10. Frito Company contracts and pays for the painting of all trucks. Such painting includes the painting of new trucks and the repainting from time to time of old ones. The trucks are all painted in a distinct design, in the same color combinations, and the designation of Frito products is prominently displayed on said trucks. In the event the salesman leaves the employ of the company and decides to retain his truck, The Frito Company, at its own expense, paints out the designation of the Frito products on the truck.

"11. Frito Company pays all vehicle license, weight and registration fees upon the trucks.

"12. Frito Company at all times contracts for and pays the premiums upon fire, theft, $50 deductible collision, public liability and property damage insurance upon the trucks in question. Frito Company secures fleet rates on such insurance. Any collision damage not covered by insurance must be paid by the salesman.

"13. In order to obtain the financial advantage of fleet discount purchases, new trucks are purchased from the truck dealer or manufacturer for particular salesmen in the name of Frito Company.

"14. If the salesman for whom a new truck is purchased is unable to pay cash, financing is arranged through a bank as follows: A down payment is made by the salesman to Frito Company; Frito Company executes an installment note to the

bank for the unpaid balance, together with a chattel mortgage upon the truck involved.

"15. Frito Company at all times is registered with the Department of Motor Vehicles as the registered owner of the trucks; so long as the installment note remains unpaid, the bank is registered as the legal owner; when the note is paid in full, legal ownership is transferred from the bank to the salesman.

"16. The salesman gives Frito Company written authorization to deduct from his commissions an amount of money equal to the monthly installment due to the bank under the installment note on the truck he uses. A copy of each form of authorization will be introduced as a plaintiff's exhibit.

"17. The salesman is put into immediate possession of the new truck. Since the salesman pays to Frito Company exactly what Frito Company must pay upon the truck, the company realizes no direct monetary gain from the transaction.

"18. When Frito Company purchases new trucks, it pays the California sales and use tax. However, since possession is given to the salesman without use of the vehicle by Frito Company, the above-described transaction under which the salesman acquires a new truck was not assessed by the State Board of Equalization as a taxable sale and, hence, such transactions are not directly involved in this action.

"19. When a salesman purchases a delivery truck, the company sets up a truck allowance on its books wherein the cost of the truck is amortized over a period of sixty months, determined as the estimated useful life of the truck. A monthly credit of one-sixtieth (1/60th) of the total original cost of the truck is credited to this account by the company as additional compensation to the salesman for the purpose of enabling him to have a cash fund available to replace his truck at the end of its estimated useful life.

"20. In addition to the foregoing truck allowance account, a salesman is also given a repair and maintenance allowance amounting to one cent per mile of estimated business travel with a monthly minimum of $10.00. All repair and maintenance expenses are paid from this account which belongs tual expenses, the salesman is entitled to the overallowance to the particular salesman. If the account should exceed ac- as, in effect, additional compensation. If the allowance should be insufficient to cover actual repair and maintenance expenses, the balance must be made up by the salesman from his own earnings.

"21. In addition, all salesmen receive a gasoline and oil expense allowance based upon the anticipated number of miles to be driven on a particular sales route determined by prior experience records of the company.

"22. The salesmen garage the trucks at their own homes and are free to do and use them for personal purposes at any time they may wish.

"23. If a salesman terminates his employment with the company after payment of the purchase price in full, he would be entitled both to keep the truck if he wished and to receive, in cash, the balance of his truck allowance account. If the purchase price had not been paid in full, the money in the truck allowance account is used, to the extent necessary, to satisfy the unpaid purchase price. A terminating salesman who sells his truck to a successor salesman is entitled to and does receive for his own account the purchase price paid by the new salesman.

"24. In the event a salesman leaves the employ of Frito Company the following possibilities with respect to his truck are open to him: He may retain the truck for his own future use by paying to Frito Company the balance due, if any, upon the installment note; in the event he retains the truck for his own use, he may, of course, sell the truck to whomever he pleases; he may also enter into a transaction where the truck is sold to another Frito Company salesman. Each and all of the transactions in dispute in this action involve the last-described possibility, that is, the purchase of a used truck by a successor salesman.

"25. The transactions whereunder a successor salesman purchases a used truck involve three parties: Frito Company, the retiring salesman and the successor salesman. Frito Company has control over who will be its new salesman as it controls its hiring policies.

"26. The retiring salesman receives his equity in the truck plus the amount, if any, credited to him in his truck allowance account. He receives said sum from Frito Company. The retiring salesman's equity is calculated by deducting from the sales price the amount still owed by Frito Company on its note to the bank. The defendant assessed against Frito Company sales tax upon these transactions utilizing the sales price as the measure of tax.

"27. If the successor salesman is unable to pay the full purchase price in cash, a financial arrangement similar to

that involved in the purchase of a new truck is carried out; that is, the successor salesman makes a down payment the minimum amount of which is determined by Frito Company, Frito Company borrows the balance of the purchase price from the bank, and the successor salesman authorizes deductions from his commissions to reimburse Frito Company.

"28. When such transactions are carried out, no change is made in the registered ownership of the truck, such ownership remaining in Frito Company. If at the time of the transaction the balance on the initial purchase price has not been paid, there would likewise be no change in legal ownership as it would remain in the bank.

"29. The Frito Company does not report any such sales between a retiring and successor salesman to the Department of Motor Vehicles.

"30. During the period prior to April 1, 1954 Frito Company maintained among its books and records an account designated 'Unassigned Equipment Account.' Equipment not yet assigned to salesmen was entered in the account. Out of a total of sixty-three transactions occurring during the said period prior to April 1, 1954, thirty-eight transactions, involving an aggregated sales price of $68,542.74, were entered into the unassigned equipment account. In these thirty-eight instances, the truck involved was, prior to the sale, shown in the old salesman's special truck account; then book entries were made removing the truck from the old salesman's special truck account and entering same in the unassigned equipment account; finally, additional entries were made removing the truck from the unassigned equipment account and entering same in the successor salesman's special trucking account. Of these thirty-eight transactions the entries reflect that in twenty-four instances, involving an aggregate purchase price of $41,775.01, the date of entry of the old or retiring salesman's account is different from and earlier than the date of entry into the account of the successor salesman, and in the interim the entry was in the unassigned equipment account; in the remaining fourteen instances, involving an aggregate purchase price of $26,787.73, the date of all entries was the same.

"31. During the period prior to April 1, 1954, twenty-five sales to successor salesmen, involving an aggregate purchase price of $56,447.85, were not handled through the unassigned equipment account; the book entries in these instances were

made directly from the old salesman's special truck account to the successor salesman's special truck account.

"32. After April 1, 1954, Frito Company discontinued use of the unassigned equipment account and all fifty-eight sales transactions occurring after the date, involving an aggregate purchase price of $123,935.06, were recorded through the respective salesmen's special truck accounts.

"33. Occasionally the company may purchase such used trucks to retain as emergency equipment. If these trucks are resold by the company, sales taxes are collected and paid and such instances are not involved in this action."

There was additional testimony at the trial on behalf of plaintiff.

Plaintiff's treasurer testified as follows: When the employment of a salesman was terminated he might keep his truck or he might sell it. If he told plaintiff's representative that he wanted to sell the truck to his successor salesman, he would keep the truck at his home. When a new salesman was employed to replace the retiring salesman, he might buy a new truck or a used truck. If he was interested in purchasing the truck of the retiring salesman, plaintiff's representative would tell him to go to the home of the retiring salesman to see the truck and to "check it out to be satisfied that he wants that truck because we make a strong point that we do not guarantee its condition. . . ." After the new salesman has examined the truck and has told plaintiff's representative that he would buy the truck, the retiring salesman immediately "looked to" plaintiff to immediately settle his account because he wanted the money and he did not want the truck. If the new salesman made a down payment on the truck, the amount of the payment was paid by plaintiff to the retiring salesman or to the dealer from whom plaintiff had purchased the truck. If the new salesman was unable to pay the full amount of the down payment, plaintiff would advance to him the amount of money necessary for the down payment, and the retiring salesman would receive the amount of his equity in the truck prior to the time the new salesman made the down payment. If the bank financed the purchase, the bank was informed that the financing arrangement was for the new salesman, and the bank would cause the new salesman's name and address to be written on the contract. The new salesman was not obligated to the bank, but he was obligated to plaintiff "by way of payroll deduction."

According to the testimony of plaintiff's district sales

manager, a new salesman is given an opportunity to purchase a new or a used truck; and plaintiff's representative did not try to influence the salesman in making his decision.

Plaintiff's district sales supervisor testified as follows: When he became a salesman for plaintiff in 1954 he met Mr. Myers, who was his predecessor on the route which he (witness) "took over." He checked the truck which Myers had used and he agreed to purchase the truck from Myers. He and Myers "understood" that the down payment "belonged" to Myers. He did not recall whether he and Myers discussed the matter as to whom the down payment should be paid. About three weeks after he purchased the truck, he gave the down payment to plaintiff's sales manager.

The sales supervisor testified further, in reply to a question as to how he arrived at the purchase price of the truck: "I was told at the time by Mr. Mooney [plaintiff's district sales manager] that the sales price of the truck would be somewhat less than a new truck, and within a proximity of maybe six or seven hundred dollars, and that was so far as I know what the price to me would be."

There was additional testimony on behalf of defendant.

An auditor for the defendant board testified as follows: He examined the books and records of plaintiff in April 1959. There were 129 transactions on which sales taxes were assessed against plaintiff. Plaintiff agreed that 8 of those transactions were taxable, and contended that 121 were not taxable. Thirty-eight of the 121 transactions were handled through the unassigned equipment account (see paragraph 30 of the agreed statement of facts), and 83 were handled through the salesmen's special truck accounts without any entry in the unassigned equipment account. Twenty-six of the 38 transactions, which were handled through the unassigned equipment account, were posted on plaintiff's general ledger account and 12 of those transactions were not posted. Three of the 12 transactions, which were not posted in the general ledger, were transactions in which the successor salesman was hired after the date of termination of employment of the retired salesman; and in 6 of those transactions the successor salesmen were hired before the termination of employment of the retired salesmen; and in the other 3 transactions the dates of hiring the salesmen were not available. In 37 of the 83 transactions, which were handled through the salesmen's special truck account, there was a "lag of time" or delay ranging from one to ninety days between the time a salesman retired and

the time a new employee was hired. In 35 of those transactions there was no delay; and in 11 of those transactions the dates of retirement and employment were not available.

Another auditor for defendant board testified, as follows: He audited plaintiff's books and records. He checked the records regarding the sale of a truck by Myers and the purchase of the truck by Coonis (plaintiff's district sales supervisor). The records show that Myers' employment was terminated on January 1, 1954; that Coonis purchased the truck on January 4, 1954; that at the time Myers "was promoted" there was a balance unpaid to the bank on the purchase price of the truck; and that plaintiff paid the amount of that balance to the bank.

It is stated in the joint pretrial statement that the sole issue to be decided is whether plaintiff is liable as a "retailer" within the meaning of the Sales and Use Tax Law with respect to any or all of the sales transactions "whereunder" a retiring salesman sells his delivery truck and a successor salesman purchases his truck. (The sales referred to in paragraphs 25 through 33 of the pretrial statement of agreed facts set forth above.) The court found that during the period from July 1, 1950, to December 31, 1955, plaintiff purchased 129 used trucks, or plaintiff purchased the equity in the trucks, from salesmen who were terminating their employment by plaintiff; that such purchases were made for the purpose of resale; that plaintiff sold the trucks to the salesmen who succeeded the salesmen who were terminating their employment; that plaintiff was the seller of the trucks to the new salesmen; and that the payments which plaintiff received on such sales were part of its gross receipts.

Appellant contends that the evidence does not support the findings that plaintiff purchased the trucks from the retiring salesmen and sold the trucks to the new salesmen.

Section 6051 of the Revenue and Taxation Code provides, in part: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers. . . ." Section 6015 provides, in part: " 'Retailer' includes: (a) Every seller who makes any retail sale or sales of tangible personal property. . . ." Section 6014 provides: " 'Seller' includes every person engaged in the business of selling tangible personal property of a kind the gross receipts from the retail sale of which are required to be included in the measure of the sales tax." Section 6012 provides, in part: " 'Gross receipts' mean the total amount of the sale . . . price . . . of the retail

sales of retailers, valued in money, whether received in money or otherwise. . . ." Section 6007 provides, in part: "A 'retail sale' . . . means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property." Section 6006 provides, in part: " 'Sale' means and includes: (a) Any transfer of title or possession . . . conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. 'Transfer of possession' . . . includes only transactions found by the board to be in lieu of a transfer of title, exchange, or barter."

Appellant argues that the transactions in which the new salesmen purchased the trucks were not sales by appellant for the reason that it did not transfer title or possession of the trucks and it did not receive any of the consideration arising from the transactions. Appellant argues further that questions as to when there was a sale and who were the parties to the transaction are to be determined by considering the intention of the parties; and argues further that the intention of the parties in the sales of the used trucks was that the retiring salesman was selling the trucks and his successor was buying them. In support of that argument appellant cites sections 1738 and 1739 of the Civil Code.

Section 1738 of the Civil Code provides: " (1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 1739 of the Civil Code provides: "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer. . . . [Five rules are stated here]."

It thus appears that those sections relate to the *time* when title to goods passes from a seller to a buyer. The sections do not state rules for determining who are the parties to the transaction. ■ It was a question of fact as to whether appellant was the seller of the used trucks within the meaning of the Sales and Use Tax Law. As shown above, plaintiff purchased new trucks from dealers and financed the purchases by loans which it obtained from the bank. Plaintiff was the registered owner of the trucks and the bank was the legal

owner. When a sale was made of a used truck and a down payment in the amount required was made by a new salesman, plaintiff received the payment from the new salesman and paid to the bank the amount of the loan which plaintiff had obtained for the purpose of purchasing the truck; and plaintiff paid to the retiring salesman the amount of his equity in the truck. In transactions where the new salesman did not make a down payment in the amount required, plaintiff advanced to the new salesman an amount sufficient, in addition to the amount paid by the new salesman, to make the required down payment, and plaintiff paid to the retiring salesman the amount of his equity (equity at the time the new salesman made a down payment to plaintiff). When a new salesman purchased a used truck, plaintiff obtained a new loan from the bank in the amount of the balance of the purchase price. The bank continued to be the legal owner of the truck, and plaintiff continued to be the registered owner. Plaintiff made the payments to the bank on the new loan and deducted the amounts paid from commissions of the new salesman. There was substantial evidence to support the finding that plaintiff purchased the equity of the salesmen in the used trucks and that plaintiff sold the trucks to the new salesmen.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied June 16, 1961, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1961.