[Civ. No. 57199. Second Dist., Div. Five. Sept. 10, 1980.]

NORTHROP CORPORATION et al., Plaintiffs and Respondents, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, Arthur de Goede, Assistant Attorney General, and Neal J. Gobar, Deputy Attorney General, for Defendant and Appellant.

O'Melveny & Myers, Donald R. Spuehler, Ben E. Benjamin, Martin Glenn and John W. Welch for Plaintiffs and Respondents.

OPINION

DOWDS, J.*—Defendant State Board of Equalization (the Board) assessed additional sales tax against plaintiff Northrop Corporation (Northrop) for the period from June 20, 1966, to June 30, 1969 (the audit period), which Northrop paid under protest. It brought suit for the recovery of the amounts paid plus interest and recovered judgment. The Board appeals.

No testimony was given at the trial, the case being tried on written stipulations of fact and written exhibits which the parties stipulated could be admitted into evidence. ■ The trial court made findings of fact and conclusions of law, but under the circumstances here involved, it is our right and duty to make our own determination from the uncontradicted facts. (*Montgomery Ward & Co.* v. *State Bd. of Equalization* (1969) 272 Cal.App.2d 728, 734 [78 Cal.Rptr. 373]; *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848].) We have considered Northrop's contention that where the stipulated facts contain evidentiary material it is proper

*Assigned by the Chairperson of the Judicial Council.

for the trial court to make findings of fact and that the appellate court is bound by them if supported by substantial evidence (citing, among other cases, *Business Title Corp.* v. *Division of Labor Law Enforcement* (1976) 17 Cal.3d 878, 882, fn. 3 [132 Cal.Rptr. 454, 553 P.2d 614], and *Automatic Canteen Co.* v. *Department of Agriculture* (1966) 247 Cal.App.2d 18, 22 [55 Cal.Rptr. 857]). While it is true that the stipulations recite matters of fact, these facts are not disputed, and the exhibits, apart from certain of the written stipulations admitted as exhibits, consist of documents the authenticity of which is not in question. Where there is no extrinsic evidence or it is not in conflict, it is the duty of an appellate court to make an independent interpretation of written documents and the possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve it of this duty. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) In any event, as we shall see, this case turns on a determination of whether there was a "sale" within the meaning of Revenue and Taxation Code section 6006, subdivision (a),[1] which in turn depends upon whether there was a "transfer of title" within the meaning of that statute. This case seems to us comparable to *Pac. Pipeline Const. Co.* v. *State Bd. of Equal.* (1958) 49 Cal.2d 729 [321 P.2d 729], where the Supreme Court held on the basis of undisputed facts that a certain transaction was not an "occasional sale" within the meaning of sections 6367 and 6006.5 despite a trial court "finding" to the contrary, determining that the so-called finding, "involving as it does, 'the construction of a statute and its applicability to a given situation' is actually a conclusion of law [citation]...." (*Id.* at p. 736.)

Northrop and the Boeing Company (Boeing) entered into a written contract (the Master Purchase Order)[2] under which Northrop manufactured and delivered to Boeing certain fuselage and wing fairing parts for model 747 airplanes. The Master Purchase Order set forth a target cost, a target profit, a target price and a ceiling price for the parts so manufactured and sold and provided that Northrop should be paid a price adjusted upwards or downwards depending on the relationship of Northrop's actual cost to the target cost, but not in excess of the ceiling price.

---

[1] Further section references are to sections of the Revenue and Taxation Code.

[2] The Master Purchase Order is dated January 23, 1969, and it was preceded by a letter of understanding dated March 24, 1966, and a letter contract dated March 29, 1966. The Master Purchase Order states that it supersedes the earlier documents and that its effective date shall be the date of the letter contract.

In the manufacture and delivery of the parts in question it was necessary for Northrop to use certain tooling. Although "tooling" may be somewhat of a misnomer, the term is apparently used in the aircraft industry to refer to a wide variety of machinery, equipment and structures specially designed and built to be used in the manufacture and delivery of a particular airplane or parts thereof. Northrop, it would appear, expected to recover the cost of the tooling, as well as all other costs incurred in respect of the airplane parts, from the price it was to be paid by Boeing. The Board assessed sales tax in respect of the tooling and our dispute arose. The parties have stipulated as to the measure of the tax if a taxable sale occurred.

The tooling involved is of two basic types denominated as contractor-use tooling and rotating-use tooling. The former was used by Northrop directly in the fabrication of airplane parts and included templates, blocks, dies, tools, fixtures, testing equipment and jigs. The rotating-use tooling is classified into three types: (1) strongbacks, to which certain airplane parts are attached and which provide support for them during their final assembly at Northrop's California plants and during shipment to Boeing in Washington; (2) shipping fixtures, which are frames onto which the loaded strongbacks are attached and held during final inspection and from then until shipment is completed; and (3) containers, which are reusable specially sized boxes used to contain the smaller airplane parts during shipment.

The tooling had no useful purpose except in connection with the manufacture and shipment of the airplane parts for Boeing. Northrop fabricated some of the tooling (apparently the major portion) and purchased other portions. The contractor-use tooling remained throughout the contract in the possession and use of employees of Northrop or its subcontractors. The rotating-use tooling remained in the physical possession and use of Northrop employees except during such periods as it was en route between Northrop's and Boeing's plants or was located at Boeing's facilities in the State of Washington. The airplane parts were shipped from California to Washington by rail, a seven-day trip one way. In Washington the airplane parts were removed from the containers and shipping fixtures within one to ten days and when the parts had been removed the containers and shipping fixtures were sent back to Northrop by rail for further use in the transportation of parts to Boeing. The strongbacks were used in holding the airplane parts while they were being secured to other fuselage parts in Washington and for

about one to five days thereafter and were then shipped back to Northrop in the first available railroad car, within one to ten days after arrival. While the rotating-use tooling was at Boeing's facilities in Washington, it was in the physical possession and use of Boeing employees.

Northrop paid property taxes on the tooling during the audit period, except such portion thereof as was out of California on the tax assessment day, but such taxes were included in the costs which Northrop recouped from Boeing by payments under the contract. No separate insurance policies were issued for the tooling, but it was included under Northrop's general insurance policies covering loss to its property and it is shown as specifically included in Northrop's schedule of property attached to such policies. Such policies do not provide for the payment of any portion of the proceeds thereof to Boeing and reimbursement for the cost of such insurance was not sought or obtained by Northrop from Boeing. During the audit period, tooling with costs on Northrop's books of $1,025,509[3] was scrapped. Approximately 75 percent of such scrappage occurred because of changes by Boeing in the design of the airplane parts or its shipping plans and the other 25 percent was attributable to errors by Northrop or its employees or Northrop's decision to make the part in a different way. Northrop disposed of the scrapped tooling by sale to scrap metal dealers without seeking approval of or giving notice to Boeing and it kept the proceeds of sale. Boeing, pursuant to a closing agreement with the Internal Revenue Service (the ramifications of which we shall discuss later) took depreciation deductions and investment credits with respect to the tooling.

■ The imposition of sales tax depends upon whether a sale of the tooling has occurred. Section 6006, subdivision (a),[4] provides that "sale" means and includes: "Any transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. 'Transfer of

---

[3]For purposes of comparison the target price under the Master Purchase Order for 201 shipsets (a set of parts for one airplane) was $485,875,000. On July 9, 1971, Boeing and Northrop entered into a further contract for 50 additional shipsets and use of the tooling under that and subsequent contracts continued at least to the time of trial.

[4]Other subdivisions of section 6006 contain other definitions covering specialized situations. The Board has made an alternate argument that, in the event we hold subdivision (a) does not apply, the transaction was in substance a lease under subdivision (g) or a fabrication for a consumer who indirectly furnishes the materials under subdivision (b). While we find these arguments unconvincing, we need not reach them because of our holding under subdivision (a).

possession,' includes only transactions found by the board to be in lieu of a transfer of title, exchange, or barter."

Section 4.10 subdivision F of the Master Purchase Order reads in pertinent part as follows: "Legal title to all Contractor-use and Rotating-use tooling manufactured or acquired by Contractor shall be retained by Contractor [Northrop] as security for payment of the price thereof. Subject to the provisions of this tooling clause, Contractor is hereby authorized to use such tooling in the performance of this contract. Notwithstanding Contractor's security interest in such tooling, it is agreed that such tooling shall be used only in the performance of this contract, and that Boeing may at any time (either before or after a termination pursuant to any part of the clause hereof entitled 'Termination,' or at any other time), for any reason, and in Boeing's absolute discretion, remove the tooling from Contractor's possession, or require Contractor to deliver the Tooling F.O.B. Contractor's plant to Boeing or third party, or direct Contractor to use or not to use such tooling, or take any other action with respect to such tooling that could be taken by the absolute owner thereof, including without limitation the power to divest Contractor of legal title to such tooling, whether or not the tooling is removed from Contractor's possession, and to transfer such title to Boeing or to any other party. To facilitate such transfer of title Contractor does irrevocably constitute Boeing its attorney-in-fact to execute in its name any documents appropriate to such transfer."

Section 2.14 of the Master Purchase Order provides that the "contract price does not include the following actions with respect to Contractor-Use and Rotating-Use Tooling: [¶] (i) Preservation or storage thereof after 3 months following contract completion; [¶] (ii) Packing and shipment thereof to Boeing; and [¶] (iii) Disposition thereof. [¶] (iiii) Tool dismantling if directed by Boeing." That section also contains the agreement that "[s]uch actions shall be performed in accordance with instructions issued by Boeing and an adjustment to the contract price shall be negotiated for the added cost occasioned thereby."

No action has ever been taken by Boeing under sections 2.14 or 4.10 subdivision F although in 1971, when sales of the 747 airplane slowed significantly, Boeing seriously considered terminating the contract with Northrop and moving the tooling to Washington to consolidate production of the model 747 there. Sales projections thereafter increased and no such action was taken.

Our task is to determine whether "[a]ny transfer of title," and thus a sale, of the tooling has taken place. Northrop points out to us that "[t]he time when title passes . . . to the buyer depends upon the intent of the parties, and, therefore, the form of the dealings between them cannot be disregarded" (*Standard Oil Co.* v. *Johnson* (1944) 24 Cal.2d 40, 48 [147 P.2d 577]) and that "[t]he parties are, of course, free to set up their transaction, if bona fide, so as not to be within the taxing statute. . . ."(*Id.*) The Board, on the other hand, calls to our attention "[t]he incidence of taxation depends upon the substance of a transaction. . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of . . . tax policies . . ." (*Comm'r.* v. *Court Holding Co.* (1945) 324 U.S. 331, 334 [89 L.Ed. 981, 985, 65 S.Ct. 707]) and that "[i]n interpreting [a] transaction the taxing authority is not necessarily bound by the language the taxpayer chose to describe it or by the bookkeeping entries chosen to record it." (*W. E. Hall Co.* v. *Franchise Tax Bd.* (1968) 260 Cal.App.2d 179, 183 [66 Cal. Rptr. 911].) We agree with both of these propositions and do not find them inconsistent. As applied to the instant case, there has been a sale of the tooling to Boeing if title has in fact passed to that company, even if in their contract Northrop and Boeing included the words that "[l]egal title to . . . tooling . . . shall be retained by [Northrop] as security for the payment of the price thereof. The choice by the Legislature of the criterion of "transfer of title," a concept having its origin in the law of real property, for the determination of the incidence of taxation relating to tangible personal property was not entirely felicitous. As pointed out in *Smith* v. *Bank of America etc. Assn.* (1936) 14 Cal. App.2d 78, 85 [57 P.2d 1363], "the word 'title' carries a different meaning under different circumstances and in different relations." Among other meanings, the *Smith* court states, are "ownership" or "complete ownership" in the sense of "all the rights, privileges, powers and immunities an owner may have . . . ." (*Id.*)

Webster's Third New International Dictionary (1966) at page 2400 defines "title" as "the union of all the elements constituting legal ownership and being divided in common law into possession, right of possession and right of property." Black's Law Dictionary (rev. 4th ed. 1968) at page 1655 says it is the "union of all elements which constitute ownership." Ballentine's Law Dictionary (3d ed. 1969) at page 1279 pursues this thought a little further: "The union of all the elements which constitute ownership, at common law divided into possession,

right of possession and right of property, the last two now, however, being considered essentially the same."

The tooling was of course in Northrop's possession during the audit period, except for such times as rotating-use tooling was in Boeing's possession in Washington. This in itself does not prevent title from passing to Boeing. A similar situation existed in *Lockheed Aircraft Corp.* v. *State Bd. of Equalization* (1978) 81 Cal.App.3d 257 [146 Cal.Rptr. 283], where Lockheed purchased special test equipment for resale to the federal government and use on government contracts. It was held that use of the equipment while in the possession of Lockheed was that of the owner, i.e., the United States, and such possession and use did not prevent title from vesting in the United States. (*Id.* at p. 272.) On the other hand, something more than a mere unexercised contractual right to acquire possession must exist to vest ownership or title in a party. In *Frances H. Leggett & Co.* v. *County of Los Angeles* (1965) 235 Cal.App.2d 752 [45 Cal.Rptr. 561], the question was whether the seller or buyer of certain equipment was the person "owning, claiming, possessing, or controlling" it on the tax assessment day and thus liable for property taxes on it. On that day an agreement for the sale and purchase of the equipment, to take place at a "closing," was in existence. Several acts remained to be done before the closing could take place, but the agreement provided that at any time after the agreement was signed the buyer could remove the assets from the seller's plant and upon such removal the assets should constitute the property of the buyer irrespective of whether the closing had taken place. The assets had not been so removed on the tax assessment day and it was held that the seller remained the owner and liable for the tax.

The words and actions of the parties shed some light on the meaning of the language of section 4.10 subdivision F of the Master Purchase Order. A draft of the letter contract which preceded the Master Purchase Order provided "Seller [Northrop] agrees to provide Boeing paramount rights of tool usage and transfer. Seller agrees to evaluate and report to Boeing within ___ days from the date of this Letter Contract recommendations pertaining to ownership of tools with respect to tax obligations to Boeing. Seller further agrees that final decision as to tool ownership will vest with Boeing." A memorandum of the negotiations suggests a tax motivation for the language, reading: "Boeing will retain paramount right of tool usage and control. Tool ownership will be vested with Northrop which will provide use tax relief to Boeing. Northrop will capitalize tooling and obtain investment tax credit which

will be credited against the Boeing 747 program. Boeing will pay Northrop use tax on tooling material and personal property tax on tools." By October 1966, however, a Northrop interoffice memorandum respecting a meeting between Boeing and Northrop indicated an intention that if possible Boeing should claim the investment tax credit for maximum tax advantage. By February 22, 1967, a Boeing memorandum respecting a trip to Northrop to discuss tax matters relates that during a meeting "...various methods of treating property taxes, sales and use taxes, and investment tax credit [were discussed]. We became heavily involved in Northrop's methods of accounting for costs internally, since many California taxes are paid on the basis of how you account for your costs and report to stockholders.

"I pointed out various methods Northrop could use in their accounting which would minimize the taxes they pay for which Boeing is obligated to reimburse them directly.

"It was my impression that Northrop was not overly interested in saving Boeing tax money. However, they did agree, subject to our submission of a written proposal and acceptance by Northrop management, to go along with our requested handling."

Boeing then proposed that Northrop retain title to the tooling and pay California sales and use tax and declare it for property tax on the basis of Northrop ownership, the letter agreement be amended to state that Boeing will take the investment tax credit on tooling, Northrop to treat the tooling "as a sale to Boeing for accounting purposes...." The proposal further recited that Northrop desires that the clause relating to reimbursement for use taxes on tooling be expanded to include sales and use taxes and that Northrop feels that by allowing Boeing to claim the investment tax credit they are losing the benefits of the cash flow from it. Boeing stated that it was agreeable to supplement Northrop's cash flow in an amount approximately equal to the net tax benefits Northrop will lose by not capitalizing the tools and taking the investment tax credit.

By April 8, 1967, a tax agenda shows Boeing's position to be that it would obtain greater tax benefits than Northrop from taking the investment tax credit and Northrop's right even to take it was in Boeing's opinion questionable—"On the basis that Boeing is actually buying the tooling, as evidenced by a separate purchase order, [Northrop's] ac-

counting treatment may be disallowed by Internal Revenue and result in a total loss of the investment tax credit."

According to a memorandum of a discussion on August 10, 1967, the following matters were agreed upon: "Boeing, and not Northrop, will claim the investment tax credit and depreciation with respect to the 747 special tooling. Northrop's loss of cash flow is to be mutually agreed to and the payment schedule adjusted to offset the effect prior to the present agreement being amended. . . . Northrop will treat 747 special tooling as being Northrop-owned for California sales and use tax purposes . . . . Boeing will reimburse Northrop for, and hold Northrop harmless from, any and all such taxes, and any interest and/or penalties, legal fees, and extraordinary costs associated therewith whenever such taxes and/or interest [or] penalties result from Boeing requested tax treatment."

The Master Purchase Order, incorporating the result of the parties' protracted negotiations, was entered into on January 23, 1969. On March 21, 1969, the Internal Revenue Service issued a ruling based on a request by Boeing, Northrop and other contractors that ". . . Boeing, as purchaser, is the equitable owner [of the tooling] and is therefore eligible to claim depreciation and the investment credit with respect thereto. . ." and Boeing and the government entered into a closing agreement to that effect. In issuing the ruling, the Internal Revenue Service took into consideration that "legal title" would remain in the contractor, but based its finding that Boeing was the "equitable owner" on these factors among others: (1) Boeing may at any time, for any reason and in Boeing's absolute discretion remove the tooling from Northrop's possession or require it to deliver the tooling to Boeing; (2) Boeing may direct Northrop to use or not use the tooling or take any other action with respect to the tooling that could be taken by the absolute owner, including the power to divest Northrop of legal title to the tooling; (3) Boeing represented to Internal Revenue that it is unconditionally obligated to purchase the tooling from Northrop; (4) Boeing has relieved Northrop of all risk of loss with respect to the recovery of the price of the tooling, subject only to the incentive price revision clause of the contract or termination of the contract by Boeing for lack of sales or for convenience; and (5) Northrop must control or account for the tooling to standards prescribed by Boeing.

For much the same reasons as motivated the Internal Revenue Service to allow Boeing to depreciate and claim the investment credit for

the tooling, we hold that, notwithstanding the language of the Master Purchase Order that legal title to the tooling shall be retained by Northrop as security for the purchase price thereof, title did pass to Boeing and a sale occurred. The purported retention of title "as security for the purchase price," if not window-dressing, does not alter the fundamental nature of the transaction. One wonders what measure of security Northrop obtained from the so-called retention of title when Boeing not only had the right "at any time...for any reason, and in [its] absolute discretion, [to] remove the tooling from [Northrop's] possession, or require [Northrop] to deliver the [t]ooling...to Boeing or [a] third party or [to] direct [Northrop] to use or not to use such tooling, or take any other action with respect to such tooling that could be taken by the absolute owner thereof, including without limitation the power to divest [Northrop] of legal title to such tooling...and to transfer such title to Boeing or to any other party" but also had an irrevocable power of attorney from Northrop to execute in its name any documents appropriate to such transfer.

Northrop's fall-back positions with respect to the rotating-use tooling are also without merit. Section 6364 exempts certain containers "when sold with the contents...." Under the Master Purchase Order, title to the tooling passed to Boeing when it was fabricated or acquired by Northrop, in accordance with our foregoing analysis, whereas "the contents," i.e., the airplane parts, were subject to final inspection and acceptance by Boeing in Washington under paragraph 4.5 subdivision B. The interstate commerce exemption of section 6396 is also inapplicable. Not only was the rotating-use tooling put into use in California before leaving the state, it was never intended, in normal use, to leave California permanently but rather to be shipped back and forth.

The judgment is reversed with directions to enter judgment for defendant, appellant to recover its costs on appeal.

Stephens, Acting P. J., and Ashby J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 4, 1980.