Filed 11/28/17 On rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY OF FONTANA et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION,[*] <br><br>     Defendant and Appellant; <br><br> CITY OF ONTARIO et al., <br><br>     Real Parties in Interest <br>    and Appellants. | A147642 <br><br> (Alameda County Super. <br>  Ct. No. RG14721676) |

If a municipality imposes a sales tax, the State Board of Equalization (Board or BOE) has the statutory authority to collect and then remit the tax back to the municipality. But what if more than one municipality claim that the taxable sale occurred within its jurisdiction? Included in the Board's authority is the power to determine where sales of personal property occur, and the correlative power to designate the municipality that will receive any local sales tax that is being collected by the Board. Here, following

---

[*] During the pendency of this appeal, most of the duties of the State Board of Equalization—including the one at issue here—were transferred to the newly created California Department of Tax and Fee Administration (Stats. 2017, ch. 16, § 5, adding Gov. Code, § 15570.22), which "shall be substituted for the State Board of Equalization" in any action "to which the board is a party." (Stats. 2017, *supra*, adding Gov. Code, § 15570.24, subd. (b).) In accordance with this directive, we granted the motion of the State Board of Equalization to substitute the California Department of Tax and Fee Administration. However, because it is the actions of the State Board of Equalization which are described and reviewed in this opinion, we think clarity and accuracy will be best served by continuing to refer to that entity.

1

an internal reorganization of an existing seller, the Board decided that local sales tax which had been remitted to Cities A and B would be "reallocated" to City C. The trial court set aside this decision, issuing a writ of administrative mandamus directing the Board to reconsider the issue.

No one is satisfied with the trial court's action, and thus we have four appellants: (1) the Board, contending that the trial court should have left the Board's decision intact had it—the trial court—applied the correct standard of review and deferred to the Board's administrative expertise; (2) City C, essentially in agreement with the Board, contending that it should be confirmed as the sole recipient of the sales tax, and the Board's decision reinstated; and (3) and (4) Cities A and B, in essence contending that the Board's erroneous reasoning is sufficiently clear that they should be restored as the proper recipients of the sales tax as a matter of law. Cities A and B also contend they are entitled to more than the Board awarded, namely, to "full retroactive allocation."

We agree with the Board. Although there are substantial questions about the trial court's approach, and its substantive analysis, they prove immaterial to our review, because the issue before this court is identical to the one before the trial court, namely, whether there is substantial evidence in the administrative record to support the Board's decision. And on our independent examination of the administrative record, we have no difficulty in concluding that there is. We further conclude that the manner in which the Board determined where the taxable event occurred was well within its administrative expertise and its discretionary authority to make such a determination. In light of these conclusions, we reverse and direct the trial court to enter judgment in favor of the Board. Moreover, because we conclude that cities A and B were not entitled to *any* relief, we summarily reject their claim they should be given *more* relief.

## BACKGROUND

### The Statutory Framework

California has had a state sales tax since 1933. (Stats. 1933, ch. 1020; Rev. & Tax. Code,[1] § 6001 et seq., especially § 6051.) Subsequent enactment of the Bradley-Burns Uniform Local Sales and Use Tax Law (Stats. 1955, ch. 1311; § 7200 et seq.) permits counties and municipalities to adopt their own sales taxes. (§§ 7201, 7202, 7202.5.) The Board is statutorily responsible for the "administration" of state and local sales taxes, most particularly the collection and return of local sales tax collections to the taxing locality. (§§ 7051–7060, 7202, subd. (d), 7204.) At issue here is how the Board determines which local government is to be the recipient of local sales taxes.

The sales tax is imposed "for the privilege of selling tangible personal property at retail," and is calculated as a percentage of "the gross receipts of the retailer from the sale of all tangible personal property sold by that person at retail." (§ 7202, subd. (a); see § 6051 [same for state tax].) As we explained recently: "The sales tax is imposed on retailers . . . . 'The retailer is the taxpayer, not the consumer.' [Citation.] The central principle of the sales tax is that retail sellers are subject to a tax on their 'gross receipts' derived from retail 'sale' of tangible personal property.[2] (§ 6051.) The term 'sale'

---

[1] Statutory references are to this code unless otherwise indicated.

[2] This conception of the sales tax has been recognized from its beginning: "The tax being a direct obligation of the retailer and, so far as the consumer is concerned, a part of the price paid for the goods and nothing else, it is neither in fact nor in effect laid upon the consumer." "[I]t is a tax in the same category as property and excise taxes payable by an independent contractor engaged in the business of retail sales which, although they are reflected in the higher cost of the product or commodity offered, must be considered merely as a necessary expense of conducting the business." (*Western L. Co. v. State Bd. of Equalization* (1938) 11 Cal.2d 156, 164, 166–167; accord, *Roth Drug, Inc. v. Johnson* (1936) 13 Cal.App.2d 720, 730; *People v. Herbert's of Los Angeles, Inc.* (1935) 3 Cal.App.2d 482, 483–484; cf. *Western States Bankcard Assn. v. City and County of San Francisco* (1977) 19 Cal.3d 208, 217 ["The San Francisco tax ordinances . . . contain no mandatory pass-on provisions, and it is equally clear that the mere ability to recoup the loss by raising prices will not necessarily shift the legal incidence of the tax"].) The retailer has the option of being able to "add sales tax

means '[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration.' (§ 6006, subd. (a).)"[3] (*City of South San Francisco v. Board of Equalization* (2014) 232 Cal.App.4th 707, 713 (*City of South San Francisco*); see § 6010, subd. (a) ["transfer of title or possession" also in definition of "purchase"].) And "[f]or the purpose of a [local] sales tax . . . , all retail sales are consummated at the place of business of the retailer."[4] (§ 7205, subd. (a); see Cal. Code Regs., tit. 18, § 1802.)

When last we visited the subject, we concluded that as state law did not address "when transfer of title occurs," the Board did not exceed its authority "by using section 2401, subdivision (2), of the California Uniform Commercial Code to determine that issue." (*City of South San Francisco*, *supra*, 232 Cal.App.4th 707, 728.) The cited statute provides: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading. [¶] (a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but [¶] (b) If the contract requires delivery at destination, title passes on tender there."

---

reimbursement to the sales price of the tangible personal property sold at retail to a purchaser." (Civ. Code, § 1656.1, subd. (a).)

[3] " 'Transfer of possession' includes only transactions found by the board to be in lieu of a transfer of title, exchange, or barter." (§ 6006, subd. (a).) The concept of transferring possession, but not title, never figured in the administrative proceedings and is not an issue here.

[4] This is the general rule. Exceptions are when "the tangible personal property sold is delivered by the retailer or his or her agent to an out-of-state destination or to a common carrier for delivery to an out-of-state destination," and when "a retailer has no permanent place of business in the state or has more than one place of business." (§ 7205, subds. (a), (b)(1).)

4

The concept of transfer of title, particularly where and when it occurs, is central to this controversy.

**The Taxpayer's Operations**

Up to January 1, 2006, Medline Industries, Inc. (Medline), a privately held Illinois corporation, shipped its retail health care products to Medline-owned warehouses in the City of Fontana (in San Bernardino County), and the City of Lathrop (in San Joaquin County), which Medline products were then distributed to purchasers from these locations. The shipping was done by Medline Industries Holdings, LP (Medline Holdings) which, according to Medline's senior tax officer, "owns the entire inventory of Medline and Affiliated Subsidiaries in every state, including California," The actual delivery was done by another wholly owned subsidiary, MedTrans LLC (MedTrans).[5] The warehouses from which Medline Holdings ships the products are owned by Medline, which leased them to Medline Holdings. Fontana and Lathrop received the amounts collected by the Board for those taxable sales.

Medline's practices changed by the start of 2006. In August of 2005, an existing wholly owned subsidiary, MedCal Sales, LLC (MedCal), began marketing Medline products from a facility located in the City of Ontario (in San Bernardino County), a building subleased by Medline to MedCal. This building is MedCal's sole facility in California. The shift in operations was the direct result of the "Location Agreement" MedCal executed with the Ontario Redevelopment Agency[6] whereby, in exchange for

---

[5] Particulars about MedTrans are scanty. Extrapolating from the statement of James Abrams, the "Chief Operating Officer and . . . Executive Officer responsible for Medline's Finance Division," that MedTrans "owns and operates a 280 unit truck fleet which delivers product to . . . MedCal," it seems fairly safe to conclude that Medline Holdings runs a number of inventory distribution centers, none of which is in California, and is responsible for shipping Medline products to the warehouses in California.

[6] Two points concerning the location agreement are significant.

First, it should be noted that Ontario was only responding to an overture from Medline, an overture which, in Medline's language, included a request for "financial assistance from the city." (See fn. 20, *post*.) This practice of luring retailers to relocate was restricted by the Legislature in 2009, but the change was not retroactive. (See former

5

establishing a retail facility in Ontario, 50 percent of the sales tax paid by MedCal would be reimbursed by the redevelopment agency.[7]  Only a handful of MedCal employees actually work there.  But more than 200 MedCal sales representatives, who are not employed or paid by Medline, are "assigned" to Ontario, and work out of that facility.

The MedCal executive who described himself in his declaration as "responsible for the . . . Ontario sales office" described how those orders are generated:  "MedCal sells medical supplies and equipment primarily to hospitals, nursing homes, surgery centers, doctors and other healthcare providers. . . .  [¶] . . . [¶]  MedCal sells sophisticated medical equipment and supplies that often times require special training.  MedCal's accounts require a sales rep to visit, call, instruct, advise, suggest, explain and train on product usage. . . .  Over 97% of [Medline's, MedCal's, and Medline Holdings's] sales" "are generated through the direct participation of a sales rep.[8]  After an account has been established, . . . the actual sales order for a specific order can enter the fulfillment system through one of *five mechanisms*," all of which are electronic, and all of which are directed to the Ontario facility.

---

Gov. Code, § 53084.5, added by Stats. 2009, ch. 4, repealed and largely reenacted by Stats. 2015, ch. 717; Hosseini, *Chapter 4 to the Rescue:  California Attempts to Prevent the Unjust Reallocation of Local Sales and Use Taxes* (2010) 41 McGeorge L.Rev. 600; see also Gov. Code, § 53084, subd. (a) ["a local agency shall not provide any form of financial assistance to a vehicle dealer or big box retailer . . . that is relocating from the territorial jurisdiction of one local agency to the territorial jurisdiction of another local agency"].)

Second, the signatories to the agreement were the Ontario Redevelopment Agency and MedCal.  The only mention of Medline in the agreement is that notices to MedCal are to be sent to Medline at its Illinois headquarters.

[7] Following dissolution of the redevelopment agency as statutorily ordered in 2011, its performance under the agreement was assumed by the City of Ontario.

[8] Although the point is somewhat obscure, it appears that only income generated from customer-initiated telephone calls is allocated to the Medline distribution warehouses.  This would appear to be the "1.3% of Medline's retail sales to California customers" mentioned in the trial court's order.

6

The order is reviewed at the Ontario facility.  If there is no difficulty or problem with the order, it is "fulfilled" by MedTrans picking up the desired goods at a warehouse and then delivering them to the California customer.  MedCal buys the goods from Medline Holdings, and pays MedTrans to deliver them.  The customer is told to make payment to MedCal.  In short, product distribution was still from the warehouses, but it was at the direction of Ontario, which was now the nerve center of operations.  Sales zoomed, and California became one of Medline's largest and fastest growing markets.

By January 2007, Medline had sold the Fontana warehouse and relocated its operations to a new warehouse in the City of San Bernardino (in the county of the same name).

Once the Ontario facility began operations, Medline stopped reporting to the Board that sales were occurring at the warehouses.  Instead, after obtaining a seller's permit from the Board (see § 6066; Cal. Code Regs., tit. 18, § 1699), MedCal began reporting the California sales attributable to its Ontario-based sales force to Ontario.  The net result was that Ontario would now get the sales taxes which had previously gone to Fontana and Lathrop.  This loss of millions of dollars was not going to be meekly accepted.

### Administrative Proceedings Before the Board

Medline's shift of sales operations triggered six years of administrative proceedings before the Board.  Initiated by the Cities of Fontana and Lathrop with individual petitions for "reallocation" (per Cal. Code Regs., tit. 18, § 1807) filed in November 2006, joined by San Bernardino in 2009, the intent was to recoup the amounts of sales tax they would or could have collected had Medline not shifted operations to Ontario.  The problem of reallocation was sufficiently ongoing to justify the existence of an "Allocation Group" in the Board's Audit Determination and Refund Section.

The administrative record comprises more than 3500 pages.  No substantial purpose would be served by documenting every aspect of the procedural history before the Board.  However, some features are germane to this appeal.

The formal petitions for allocation were filed only after the Board's initial investigation concluded that "based on all available information at this time, the City of Ontario will be entitled to the local tax on sales made by MedCal." Fontana and Lathrop protested that the Board's investigation had failed to smoke out the commercial realities uncovered by the cities' own sleuthing.[9] The Board's staff was initially unpersuaded, but by 2010 it had reversed course and concluded that the reallocation petitions had merit. And ultimately, over the concentrated opposition of Medline, MedCal, and Ontario, the Board's Appeals Division upheld the reallocation petitions.

Ontario appealed, and in October 2013, the five-member Board held a hearing on Ontario's appeal to reverse the Appeals Division's recommendation. In the course of Ontario's presentation, the Board heard a brief "statement" from a member of the Ontario City Council; a slightly lengthier statement by James Abrams, who gave his job description as "Chief Operating Officer of Medline Industries, Inc.," "the executive officer responsible for Medline's Finance Division"; and Eric Gerstein, Medline's "VP of Tax."[10]

Gerstein's presentation is the most pertinent. He told the Board that according to Medline's internal operating and accounting procedures, goods ordered by a customer are

---

[9] Fontana and Lathrop told the Board: "Based on the research shown above, it does <u>not</u> appear that MedCal's Ontario office is the place that the company's 214 sales representatives report to on a regular basis. It is also evident that the Ontario office does not review and process all order[s] placed by California customers. All the information we received indicate that the sales representatives call on clients, deliver new product information, establish new accounts and pricing, etc. After an account is established, customers are directed to place orders via internet or by calling or faxing the Iowa call center. In almost all cases, the first point of California contact with a customer orders [*sic*] are the fulfillment and distribution centers in Fontana and Lathrop."

[10] Medline has a headquarters staff that, pursuant to the "Administrative Services Agreement," provides every subsidiary with "general services related to overall management and strategy, accounting and bookkeeping, legal, human resources, information technology and other corporate management services." Gerstein told the Board this avoids "duplicate functions when they're not needed." The subsidiaries are billed by Medline for these services. In Gerstein's words: "we run very lean, Medline does." These services cost MedCal approximately $16 million per year.

"purchase[d]" by MedCal from Medline Holdings, at which point title was transferred from Medline Holdings to MedCal "and from MedCal Sales on to the customer." This practice is "just like your typical drop shipment arrangement." Apart from the work of the sales representatives, and the limited amount of paperwork they generate with new clients, Medline and its subsidiaries have implemented a "streamlined" electronic process. Medline's counsel (MedCal was not separately represented at the hearing) told the Board that MedCal takes title when it purchases the goods sitting in a warehouse, and then transfers title to the customer at or "just before" the goods are shipped by MedTrans. This was identical to what Gerstein told the Board about operation of Medline's paperless system: "electronically," "title would be transferring on to MedCal . . . and then from . . . MedCal to the customer."

The Board also heard from its legal department, which defended the conclusion of the appeals division that the sale should be deemed to occur at Medline's warehouses, and thus the sales tax should be allocated to the municipalities where the respective warehouse was located. At greater length, counsel for Fontana, Lathrop, and San Bernardino echoed this recommendation.

By far the largest part of the hearing was spent on "discussion" and questions by the Board. Some of the questions were answered by Gerstein and Robert Kievert, who worked under Gerstein as Medline's "Director of Tax."[11] In response to a question, Gerstein acknowledged there was no writing documenting the passage of title to the customer, and "we don't have that . . . legal document . . . that would actually clarify that MedCal is purchasing from Industries Holdings." However, "journal entries in the books and records of the companies . . . would show that . . . the product is being sold from . . . Industries Holdings . . . to MedCal and then from MedCal to the customer."

---

[11] In his declaration, Kievert stated he is "solely an employee of Medline Industries," his actual "business title is Director of Tax, Compliance and Audit," and he is "responsible for the tax compliance and tax audits, for Medline and its wholly owned subsidiaries, including MedCal."

"[I]t's an internal process, so . . . it's something we should have done and, admittedly, didn't document properly."

The following day, the members of the Board announced the decision. Member Betty Yee stated she believed the various documents between Medline entities "were established more to deal with issues of liability among the entities . . . and less about . . . consideration of . . . tax requirements." "But I am . . . convinced and . . . was compelled by the testimony yesterday about the . . . title flow." Member Jerome Horton agreed, cautioning that form should not be elevated over substance. Yee's motion to "find for Ontario" was seconded and passed without discussion.

In January 2014, the Board formally decided in Ontario's favor. Disagreeing with the appeals division—which had submitted a 28-page proposed decision and recommendation that the reallocation petitions be granted—the Board unanimously denied the petitions. In its five-page decision adopted on January 16, 2014, the Board addressed two points. The first point was stated to be "Whether taxpayer [MedCal] was the person making the taxable sales to California purchasers."[12] Based on documents (i.e., "invoices from suppliers," "purchase orders from customers") and representations made "at the Board hearing," the Board determined that MedCal, not Medline, should be treated at the "taxpayer": "We find that title to the goods passed . . . to taxpayer and then to taxpayer's California customers based on the credible and persuasive explanations provided by taxpayer's representatives and the corroborating journal entries and financial

_____

[12] Each of the two issues was denominated as a "LEGAL ISSUE" and subdivided into "FINDINGS OF FACT," "APPLICABLE LAW," and "ANALYSIS & DISPOSITION." As will be seen, both of the Board's ultimate determinations was stated in the language of a finding of fact ("[w]e find"), and correctly so. The Board's characterization of what it was deciding as "legal issue[s]" will not be followed. (Cf. *Linberg v. Stanto* (1931) 211 Cal. 771, 776 ["It is well settled . . . that a finding [of fact] may be regarded as one of fact, although mistakenly placed among the conclusions of law."]; *Babcock v. Houston* (1973) 33 Cal.App.3d 858, 865, fn. 2 ["if . . . findings and conclusions are made, they will be considered in their true character irrespective of the classification in which they may be included."].)

10

statements provided by taxpayer. Thus, we conclude that taxpayer is the person who made the subject sales to California customers."

The second issue addressed by the Board was "Whether taxpayer correctly allocated the local tax as sales tax to Ontario." Again, the Board acted on the basis of "statements" made by MedCal's representatives at "the Board's hearing," as well as "declarations signed under penalty of perjury by some inside and outside sales staff who stated that they were employees of taxpayer and knew the Ontario office was their only office for purposes of performing their sales activities."

And thus the conclusion in favor of Ontario: "We find credible and persuasive the statements made by taxpayer's representatives that the outside sales staff principally negotiated the subject sales and that they were assigned to work out of taxpayer's Ontario office when they became employees of taxpayer. This means their selling activities are attributed to the Ontario office even when such activities are done from their homes, on the road traveling to meet customers at their places of business, or at the customers' places of business. Thus, the sales are subject to sales tax based on the undisputed fact that title to the goods passed inside California and based on our finding that the Ontario office participated in the sales by virtue of the activities of the outside sales staff. Since the negotiations by the outside sales staff are associated with the Ontario office, we find taxpayer is required to hold a seller's permit for that office. We therefore conclude taxpayer correctly allocated the local tax as sales tax to Ontario."

**Proceedings in the Trial Court**

**The Petition**

In April 2014, Fontana, Lathrop, and San Bernardino (hereafter collectively Cities) commenced this action by filing a petition (superseded within a week with a first amended petition) for a writ of administrative mandamus and declaratory relief. The goal was "to obtain redress for over $17 million in local sales tax revenues" that the Board "improperly allocated, since 2006 and continuing to the present day, to . . . City of Ontario."

11

In their first cause of action, styled "Petition for Writ of Mandate—Code Civ. Proc. § 1094.5,[13]" Cities termed it a "prejudicial abuse of discretion" for the Board to determine that Medline was the retailer. Cities alleged that "the critical evidence . . . regarding product title transfer and the intra-enterprise contractual duties between Medline and its various wholly-owned subsidiaries confirms that Medline—not MedCal—has always been, and remains, the retailer. Thus, the local sales tax revenues at issue generated by the sales of Medline products should be allocated to Petitioners, as they were before 2005."

Expanding on this point, Cities further alleged: "The 'retailer' is Medline, not MedCal, as evidenced by: (a) the chain of title, including invoices from Medline's suppliers showing Medline as the purchaser, purchase orders from California customers issued to Medline, invoices to customers prepared by Medline showing Medline as the seller and calling for payment to Medline's location, and payments from California customers to Medline; and (b) multiple agreements between Medline, MedCal, and other wholly-owned Medline subsidiaries, including a subsidiary named Medline Industries Holdings, LP ('Holdings'), which clarify that Medline uses its subsidiaries to approve *Medline*'s customers' sales orders and to manage *Medline's* sales to customers, and that title to the goods sold to California customers generally rests with Holdings through the time of transit to the customer, at which time the sale from Holdings to Medline is completed and, in turn, the sale from Medline to the California customer is completed."

In their other cause of action, Cities sought declaratory relief to the effect that the Board's decision was incorrect, thus obliging it "to correct, reallocate, and redirect to

---

[13] Cities also alleged a cause of action for "Petition For Writ of Mandate—Code Civ. Proc. § 1085," that is, traditional mandamus. However, the trial court noted the parties' agreement that "the petition is properly under CCP 1094.5." This agreement was clearly sound (see, e.g., *City of Palmdale v. Board of Equalization* (2012) 206 Cal.App.4th 329, 339 [Board's sales tax allocation decision "was a quasi-judicial ruling governed by section 1094.5 of the Code of Civil Procedure"]; 1 Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2017) § 1.7, p. 1-7), and this opinion is confined to the procedures and requirements of administrative mandamus alone.

Petitioners . . . the . . . past incorrect payments of sales tax revenues to Ontario," those payments totaling $17,667,453 "as of October 2013."

Cities prayed for: (1) issuance of a writ of administrative mandamus commanding Ontario and MedCal "to either return to [the Board] or to pay directly to Petitioners all of the local sales tax revenues at issue, in the correct amounts due . . . totaling no less than $17,667,453 as of October 2013, along with additional local sales tax revenues since October 2013, . . . plus pre-judgment interest" and (2) "declaratory relief, as set forth above and/or otherwise consistent with the relief sought herein."

**The Trial Court's Decision**

The matter was submitted to the court on the basis on the administrative record; a "Joint Compendium" submitted by Cities of 34 exhibits (29 of which were already in the administrative record); written briefs; and extensive argument.

The court's decision came in the form of a detailed 26-page order that obviously reflected considerable industry and thought. The first subject addressed was the standard of review the court would use. The court concluded that the administrative mandamus review did not involve a fundamental vested right, but rather "merely economic" interests—"the allocation of sales taxes among local governments"—and thus it would review the Board's decision "under the substantial evidence standard." (See, e.g., *Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280–1281 and authorities cited; *Hunt-Wesson Foods, Inc. v. County of Alameda* (1974) 41 Cal.App.3d 163, 175–176 [decision of county board of equalization reviewed in administrative mandamus for substantial evidence]; cf. *Duffy v. State Bd. of Equalization* (1984) 152 Cal.App.3d 1156, 1172 & fn. 11 [action for refund of sales tax on ground of allegedly unconstitutional regulation; dictum that "Payment of sales tax does not involve . . . a . . . fundamental right"].)

The court then considered "whether to defer to the BOE's evaluation of witness credibility and the court finds that such deference is not appropriate in this case. As permitted by 18 CCR [Cal. Code Regs., tit. 18] 5523, the Medline entities presented their case through representatives and, as permitted by 18 CCR 56523.7(d), the representatives

13

did not testify under oath.  In this circumstance, the BOE had no opportunity to observe the demeanor, manner, or attitude of any percipient witness.  In this circumstance, the BOE, listening to unsworn hearsay representations, and the court, reviewing those representations on a paper record, are equally well situated to consider the credibility of the witnesses."

The court then moved to the issue of transfer of title under section 6006, specifically the "Fact Issue" of "Which Medline entity was the 'retailer' that transferred title to consumers."  Because "[t]he intent of the parties is the most important factor in determining if, when, or where title has been transferred," the court then addressed a number of documents in the administrative record to discover "[t]he factual issue" of "the identification of the retailer."  Its examination led the court to conclude "[t]he evidence is consistent and shows that during the relevant time period, the customers of the Medline entities thought that they were receiving title from Medline."  "These documents strongly suggest that customers thought that they were buying the products, and obtaining title, from Medline," which "the customers understood that Medline . . . was the . . . entity responsible for paying sales tax."

The court's examination of a number "[*c*]*ontracts between and among the Medline entities*" showed that a number of them "state that Medline . . . was transferring title to the customers."  Moreover, "At the BOE hearing, [four] Medline witnesses testified consistently and repeatedly that the Medline entities did not have contracts stating that . . . title to goods was transferred from Holdings to MedCal."

Next, "The internal bookkeeping entries of the Medline entities show that Holdings sold goods to MedCal and that MedCal recorded revenue from customers.  The internal bookkeeping entries of the MedCal entities reflect the internal intent or understanding of the Medline entities, but do not reflect the 'objective manifestations of agreement or objective expressions of intent' of the parties in the retail transactions.  Therefore, the bookkeeping entries of the Medline entities are not relevant to the issue of which entity passed title to the customers in the retail transactions."

14

Lastly, the court looked to "*Statements of Representatives*" at the hearing before the Board. "Cities were represented by Ms. Sturdivant, who stated . . . that she conducted a transaction with the Medline entities and that MedCal was never mentioned. Medline's representatives stated that Ms. Sturdivant's transaction was representative of approximately 1.3% of Medline's retail sales to California customers. [¶] Medline's representatives stated that Holdings purchased goods from suppliers, then Holdings stored the goods in warehouses, then MedCal sales representatives negotiated sales of the goods, then MedCal notified Holdings of the intended sale, then Holdings passed title to MedCal, and then MedCal passed title to the customers. Medline's representatives stated that 98.7% of Medline's retail sales to California customers were conducted this way."

The court's legal analysis proceeded as follows:

(1) "There is no substantial evidence to support the BOE's factual conclusion that MedCal passed title to consumers and therefore was the retailer . . . . The law and the evidence compel the conclusion that Medline passed title to the customers and was therefore the retailer. The law required the BOE to focus on the intent of the parties to the retail transactions and to discern that intent from the contracts between the parties to the retail transactions. The contracts with customers and the invoices to customers clearly identify Medline . . . as the seller. The contracts among the Medline entities clearly state that Medline . . . was to sell the goods to the customers. California law follows the objective theory of contracts under which 'the parties' undisclosed intent or understanding is irrelevant to contract interpretation.' [Citation.] Looking at the contracts, it is clear that under California law it was Medline . . . that sold the goods to, and passed title to, the customers. Furthermore, the Supply Agreements [aka Corporate Program Agreements] signed in 2010 address the issue of sales taxes specifically and state that it is Medline Industries, Inc. . . . that was responsible for the sales taxes on the Products and Services provided to customers. . . .

"Medline argued that the BOE was permitted to ignore the understandings of the consumers who received title and ignore the language of the contracts between and among the Medline entities and instead find MedCal passed title to consumers because

15

under the terms of contracts that did not exist, Holdings was supposed to have transferred title to MedCal so MedCal could then transfer title to consumers. This argument is based largely on the internal understandings and journal entries of the Medline entities. This argument must fail because it is contrary to the clear terms of the actual contracts and can be viewed as a de facto attempt to reform the contracts to include MedCal as a party. [Citation.] The journal entries among the Medline entities might inform the interpretation of the contracts among the Medline entities, but they certainly cannot change the terms of the contracts between the Medline entities and their customers."

(2) "Alternatively, Medline's argument can be viewed as an attempt to treat Medline's subsidiary corporations as Medline divisions. Mr. Gerstein, Medline's Vice President of Tax, stated, 'our customers, frankly, don't care which legal entity it is, they care about buying Medline product and getting the Medline Reputation and quality that comes with it.' . . . .

"Based on the current record, the BOE could not, and the court will not, ignore the separate corporate existence of the subsidiaries and treat them as the alter egos of Medline. The Corporate Program Agreements are on their faces between Medline and certain customers and the invoices direct the customers to pay Medline. It would be peculiar if, in a contract dispute between a customer and Medline, a court were to find that the customer's contract claim was actually against MedCal, which is never mentioned in any of the Corporate Program Agreements." (Fn. omitted.)

(3) "The contemporaneous documentary evidence of bookkeeping entries within and among the various Medline entities shows that the Medline entities operated as though title to the goods were transferred from Holdings to MedCal so that MedCal could then transfer title to customers. The accounting for sales among corporate entities up the supply chain is not relevant to the inquiry of what the parties to the retail transaction intended. The contracts and invoices suggest that customers thought they were being billed by, were paying, and were receiving title from, Medline (parent). Perhaps more importantly, the Medline entities cannot create a fictitious alternative chain of title not based on, and in derogation of, the language in the pertinent contracts. Medline's

16

assertions that the Medline entities intended MedCal to have title and used internal bookkeeping entries consistent with the notion that MedCal had title does not require, or support, a finding that MedCal actually had title."

(4) "Medline argues that its transactions are electronic and that as a result there is no 'paper trail' of title. The user of paper or electronic records is beside the point. The point is that there is no substantial evidence to support the conclusion that MedCal transferred title to consumers. Medline's internal accounting entries, whether electronic or on paper, cannot change the parties to the taxable retail transactions."

(5) "The court finds that the BOE failed to apply established California law on the transfer of title, and that under the correct application of California law there is no substantial evidence for the BOE's factual finding that MedCal (the sales entity) transferred title to the customers and was responsible for paying the sales tax."

(6) "Having found that there is no substantial evidence for the BOE's conclusion that MedCal was the retailer, the court does not reach the issue of which Medline entity was the 'retailer.' That is a factual issue for the BOE on remand. Similarly, the court does not reach the issue of where the 'retailer' is located, as that too is a factual issue for the BOE on remand."

(7) As to the "Remedy," "The court will remand the matter to the BOE with instructions to vacate the Summary Decision in Case No. ID 435564 dated 1/16/14. [¶] The BOE may then conduct further hearings and issue a decision on the identity of the retailer for purposes of California sales taxes as well as the location of the retailer for purposes of allocating local sales taxes. In any such decision, the BOE must reconsider the issue of which entity passed title to consumers and was the retailer in light of this court's opinion and California law on the transfer of title . . . . In any such decision, the BOE may exercise its judgment and discretion in evaluating the evidence and reaching factual conclusions. [¶] On remand, the BOE may also address whether, or how, to reallocate the tax revenue for the years in question."

17

A judgment directing issuance of a writ of mandate to the Board was entered in due course, from which these timely appeals were perfected by all the parties.[14]

## DISCUSSION

### The Standard of Review

Although the able briefs of counsel for the parties cover a wide area of subjects, the actual inquiry before us is quite limited. However, we are met at the outset with a unbridgeable gulf between what the parties see as the proper standard of review for this court, and the trial court.

Given the parties' agreement that no fundamental right is involved, and there being no question that the Board proceeded in the manner required by law, this court on review would apply the identical standard as the trial court—is there substantial evidence in the administrative record to support the Board's summary decision No. ID 435564? (E.g., *Benetatos v. City of Los Angeles*, *supra*, 235 Cal.App.4th 1270, 1281; *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058.) Should a question of law or statutory construction be presented, we would exercise our independent review. (E.g., *Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487; *Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1007–1008.)

The Board appears to accept this, in part. Its sole argument in its opening brief is stated in these terms: "The judgment should be reversed because substantial evidence supports the Board's decision; and the Superior Court erred in rejecting competent evidence and failing to correctly apply the substantial evidence standard." The specifics cited for the second claim is that the Board based its decision in large part "on convincing and compelling live witness testimony," and because "[w]itness credibility is within the

---

[14] Actually, the notices of appeal by the Board, Ontario, Medline, and MedCal were filed prior to entry of the judgment. In accordance with the principle that notices of appeal are to be liberally construed in favor of their sufficiency, each notice will be deemed to refer to the subsequent judgment. (Cal. Rules of Court, rules 8.100(a)(2), 8.104(d).)

18

sole purview of the Board as the factfinder," the trial court erred by failing "to defer to the Board's evaluation of witness credibility" and "in rejecting testimony it deemed hearsay" that was not given under oath. In addition, "the superior court did not properly apply the substantial evidence standard because it drew its own inferences regarding consumers' intent from conflicting evidence, rather than considering the facts in favor of the BOE Decision and giving them every reasonable inference." "Instead, the superior court wrongly . . . resolved conflicts in the evidence in the Cities' favor." "If the superior court had correctly applied the substantial evidence standard of review, by considering 'the facts in the light most favorable to the Board, giving it every reasonable inference and resolving all conflicts in its favor' [citation], it would have easily upheld the Board's decision."

Cities do not argue that a fundamental right is involved, and they concur that "the standards governing this court's review are identical to those used by the trial court." Even though they ostensibly prevailed in the trial court, Cities nevertheless maintain the trial court employed the wrong standard of review, which they see as far more restricted than does the Board or did the trial court. This is how they frame the issue:

"The trial court determined that the BOE failed to proceed in the manner required by law, because it 'failed to apply established California law on the transfer of title.' In short, the BOE failed to properly interpret and apply the determinative Revenue and Taxation Code provisions. The central issue presented to the trial court was whether the BOE erred in its legal determination on undisputed facts that MedCal, and not Medline, was the retailer under Revenue & Taxation Code section 6015(a)(1). The facts establishing the identity of the retailer were not disputed; rather, they were memorialized in Medline's own written transactional documents, to which Medline is bound, and which cannot be contradicted by extrinsic evidence.

"It is well established that the application of the tax statutes to undisputed facts, *as was involved here*, presents a question of law to the trial court. [Citation.] The BOE's application of law is not entitled to deference under the circumstances. [¶] . . . [¶]

19

"Because the BOE failed to properly apply the governing statutes and regulations to undisputed evidence, the independent judgment (or independent review) standard applies here. The relevant facts in the record were undisputed, and assessing witness credibility was not an issue. The key issues involved application of the statutory and regulatory framework to those undisputed facts to determine whether Medline's documented transfer of title to California customers justified allocation of the tax revenues at issue to Ontario, based upon the BOE's interpretation that MedCal, not Medline, was the retailer under the statute. . . .

"Even though interpreting the applicable statutes and applying them to the undisputed facts presented a purely legal issue, the trial court instead characterized 'the identification of the retailer' as a factual issue, and it concluded that 'there is no substantial evidence to support the BOE's factual conclusion that MedCal passed title to consumers and therefore was the retailer as defined in Rev. and Tax 6015(a)(1).' Although the trial court applied the wrong standard, in doing so, it reached the correct conclusion. There was no substantial evidence supporting the BOE's finding that MedCal was the retailer." (Italics added.)

Much of this disagreement is attributable, particularly from Cities' perspective, to the trial court's decision. For example, the court did state at the start of its decision that it "finds that the BOE failed to apply established California law on the transfer of title, and that under the correct application of California law there is no substantial evidence for the BOE's factual finding that MedCal (the sales entity) transferred title to the customers and was responsible for paying the sales tax." This could be interpreted as the trial court determining that the Board either (1) committed an error of law ("failed to apply established California law") or (2) made a factual finding in the absence of substantial evidence to support it. In truth, the trial court's decision does seem to straddle this distinction by concluding that without substantial evidence that MedCal passed title the Board could not designate MedCal as the seller (or "retailer" in the trial court's language).

20

Initially, Cities appear to want to finesse the point. By repeatedly emphasizing that there are only "undisputed facts," Cities would transmute the issue of whether Medline or MedCal passed title into a question of law to which we would bring our independent review. (See, e.g., *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758 [" '[t]he application of a taxing statute to uncontradicted facts is a question of law' "].)

But then Cities focus upon the trial court's later sentence, that "the law and the evidence compel the conclusion that Medline passed title to the customers and was therefore the retailer," which they describe as the trial court's "central holding." Cities further assert "The record supports no other reasonable conclusion," thus making the trial court's remand to the Board a pointless exercise. In fact, Cities view the issue as so patently obvious that the Board should simply be directed by the writ of mandate to reach the same conclusion (i.e., reallocate from Ontario to Cities) as did the appeals division. In short, the keystone of Cities' argument is the claimed absence of a factual dispute as to whether Medline or MedCal passed title to the customers. As will be shown, this is a profound misreading of the administrative record.

The manner in which we resolve these appeals is not a novel issue for this court, as illustrated by our discussion in *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602:

"Our review is governed by Code of Civil Procedure section 1094.5, which defines prejudicial abuse of discretion as an agency's decision being unsupported by its findings or its findings being unsupported by the evidence (*id.,* subd. (b)). Where support for findings is challenged, abuse of discretion exists if 'the findings are not supported by substantial evidence in light of the whole record' (*id.,* subd. (c)).

" 'The "in light of the whole record" language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record. [Citation.] Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the

21

evidence. [Citation.]' (*Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 141–142; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 149, fn. 22.) That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.) 'It is for the agency to weigh the preponderance of conflicting evidence. [citation]. Courts may reverse an agency's decision only if, *based on the evidence before the agency,* a reasonable person could not reach the conclusion reached by the agency.' (*McMillan v. American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 186.)

"The County and Commission urge that the trial court misapplied the standard, improperly reweighing the evidence. . . ." "[T]he . . . argument is academic in the procedural posture of this case. Our review standard on appeal is identical to the trial court's. (*Bixby v. Pierno, supra,* 4 Cal.3d 130, 149 & fn. 22.) Therefore, if substantial evidence supports the Commission's action, we reverse; if not, we affirm. Possible misapplication of the review standard below has no bearing on the outcome here. (Cf. *id.,* at p. 149, fn. 22 [because the review standard on appeal was the same, any error in the trial court's use of an ' "isolation" ' test for substantial evidence offered no ground for reversal].)" (*Sierra Club v. California Coastal Com.*, *supra*, 12 Cal.App.4th 602, 609–611, fn. omitted; accord, *Eden Hospital Dist. v. Belshe* (1998) 65 Cal.App.4th 908, 915–916.)

The Supreme Court subsequently summarized the point with more economy: "An appellate court's review of the administrative record for . . . substantial evidence . . . is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review . . . is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

Moreover, our Supreme Court has directed that "a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the

administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.) Cities would have us conduct our review with a very different perspective—"the BOE's application of law is not entitled to deference" "[b]ecause the BOE failed to properly apply the governing statutes and regulations to undisputed evidence."

It must be conceded that the tenor of the trial court's lengthy order is troubling. It appears to reflect a de novo review, with no suggestion of deference to the final result of the extensive administrative proceedings. It does seem to approach the matter from the perspective of Cities—stating what does *not* support the Board instead of looking to see what does—thus appearing to put the burdens of persuasion and proof on the Board. Also, it is disconcerting to see the statements made at the hearing by Medline officers—which obviously could support the Board's decision—virtually dismissed out of hand. True, they did not address the Board under oath, but no one at the hearing suggested that they should. As the Board notes, its rules allow for " 'hearsay evidence,' " particularly when, as occurred here, it was received without objection.[15] (Cf. 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 37, p. 85 ["No constitutional

---

[15] The pertinent regulations provide in relevant part:

"(a) Admissible Evidence. Any relevant evidence, including affidavits, declarations under penalty of perjury, and hearsay evidence, may be presented at a Board hearing. Each party will be permitted to comment on or respond to any affidavits, declarations, or other evidence.

"(b) Submission of Evidence. . . . The Board will consider any objections to, and comments on, the evidence presented at the hearing in assigning weight to such evidence. The Board may refuse to allow the presentation of evidence that it considers irrelevant, untrustworthy, or unduly repetitious." (Cal. Code Regs., tit. 18, § 5523.6.)

"Witnesses. The taxpayer . . . may offer the testimony of any person who can provide relevant information concerning the matter, including representatives of the taxpayer . . . who have knowledge concerning the facts at issue in the matter." (Cal. Code Regs., tit. 18, § 5523.7(a).) "The Board Chair may, at the Board Chair's discretion, direct any witness to testify under oath or affirmation, and any Board Member *or party to a matter* may request that any witness testify under oath or affirmation." (*Id*., subd. (d), italics added.) "Each party may cross-examine opposing witnesses . . . ." (*Id*., subd (e).)

23

provision is violated if unsworn testimony is received, and thus a party waives its objection to unsworn testimony by failing to object to it at trial."]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 369, p. 427 ["Incompetent or otherwise inadmissible evidence admitted without objection will sustain the judgment."].)  The Board was told at the outset that "the taxpayer's representatives are here to participate in this hearing," which, as already recounted, is what they did.  That participation also took the form of answering questions from members of the Board, again with no protest by Cities.  In these circumstances, the oral statements have the fullest potency to sustain the Board's decision.[16]  (See 1 Cal. Administrative Mandamus, *supra*, § 6.153, pp. 6-118–119 and decisions cited.)

A bit of practical reality should also be observed.  The Board initially allotted Ontario, assisted by Medline and MedCal, a total of 15 minutes to present their appeal.  Once again, *15 minutes*.  Even assuming that the Board had already familiarized itself with the 350 pages of Ontario's brief and exhibits, it would be a formidable job of advocacy for Ontario's counsel to acquaint the Board with the six years of administrative proceedings concerning this fact-intensive and fact-specific controversy.  Midway during the hearing, the Board allowed Ontario, Medline, and MedCal an additional *two* minutes, but this would hardly have lightened their burden of persuasion.  With time at a premium, it is hardly any wonder that counsel did not waste any by putting his "witnesses" under oath.  Moreover, this was the same informality followed by the other parties at the hearing.

Finally, it is puzzling to ponder the trial court's conclusion that the Board "had no opportunity to observe the demeanor, manner, or attitude of any percipient witness." After all, we are talking about the persons who addressed the Board at the hearing, so

---

[16] The circumstances also include Cities' failure to raise the issue in their opening trial brief.  (See *Borror v. Department of Investment* (1971) 15 Cal.App.3d 531, 547 ["The issue of lack of foundation was not raised in the petition for mandate nor in the licensee's brief in the superior court.  Accordingly, it should not have been considered by the trial court nor made a basis for its determination"].)

each person's "demeanor, manner, or attitude" *was* perceivable—indeed, perceived—by the Board, which went to the trouble to twice single out those persons as "credible and persuasive" in its final decision. As for whether these persons qualified as "percipient" or personally knowledgeable about the information in their respective statements, no such hesitation was voiced to the Board, and in any event does not appear to be required by the Board's rules. (See fn. 15, *ante*.)

Not only must we presume the correctness of the Board's decision, we must also add a very hefty dose of deference by reason of the nature of the topic and the process. "[U]nder California's sales tax law," "the taxability question, whether a particular sale is subject to or is exempt from sales tax, is exceedingly closely regulated, complex, and highly technical. A comprehensive administrative scheme is provided to resolve these and other tax questions and to govern disputes between the taxpayer and the Board. Under these administrative procedures, it is for the Board in the first instance to interpret and administer an intensely detailed and fact-specific sales tax system governing an enormous universe of transactions." (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1103.) Thus, the Board's determinations " ' "within that field carry the authority of an expertness which courts do not possess and therefore must respect." ' " (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 922, quoting *Universal Camera Corp. v. Labor Bd.* (1951) 340 U.S. 474, 488; see *Fukuda v. City of Angels*, *supra*, 20 Cal.4th 805, 812 [" 'considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence' "]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 [judicial deference appropriate because "administrative agencies to which the Legislature has delegated regulatory authority in particular areas often develop a high degree of expertise in those areas and the body of law that governs them"].) Application of the substantial evidence test does not negate this deference. (See *Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617–618.) And no party disputes that deciding allocation or reallocation of sales tax revenues is among the Board's

discretionary statutory powers.  (See § 7209 ["The board *may* redistribute tax . . . distributed to a county or city," italics added].)

Given that no fundamental right is at issue, it is more than appropriate for courts to defer to the Board's expertise in resolving this issue.  (See, e.g., *Bixby v. Pierno, supra,* 4 Cal.3d 130, 144; *Kensington University v. Council for Private Postsecondary etc. Education* (1997) 54 Cal.App.4th 27, 41, fn. 4; cf. *Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 839 ["judicial deference acknowledges a role for the Commission's . . . expertise" and " ' "special familiarity with satellite legal and regulatory issues" ' "]; Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1196 ["agencies are often immersed in administering a particular statute.  Such specialization gives those agencies an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations."].)

The possibility of disagreement ordinarily inheres in the substantial evidence standard.  (See, e.g., *Martin v. Alcoholic Bev. etc. Appeals Bd.* (1961) 55 Cal.2d 867, 880 ["the determining factor . . . was whether there was substantial evidence on which reasonable minds might differ"]; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874 [Under the substantial evidence rule, "when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*"].)  Just as with arbitration, it has long been recognized that the possibility of an erroneous decision by fallible human beings inheres in the administrative process and must be accepted:  " 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. They may decide a particular question wrong—but it is their question.  Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' "  (*Hansen v. State Board of Equalization* (1941) 43 Cal.App.2d 176,

26

179–180, quoting *Maxwell v. Civil Service Commission* (1915) 169 Cal. 336, 339; cf. *Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756–757 ["If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so."]; *Marcucci v. Board of Equalization* (1956) 138 Cal.App.2d 605, 609 ["the power of factual decision must be placed somewhere; . . . it has been placed with the board and it matters not what, upon the cold record presented, a reviewing court might think it would have done had it been finding the facts in the first instance"].) Our Supreme Court has never retreated from the principle that administrative actions should be not be overturned " '[w]here . . . there is a fair and reasonable ground for difference of opinion among intelligent and conscientious officials.' " (*Pratt v. Rosenthal* (1919) 181 Cal. 158, 163.)

This is why we emphasize that the primary focus of our inquiry is whether the administrative record has substantial evidence that *supports* the Board's decision. Our review for substantial evidence is no less than a fresh and complete reexamination of the administrative record. In that sense Cities are correct in classifying our review as independent, but they are mistaken in seeing the problem as purely one of law resting on the "undisputed facts" in that record. Some historical facts may not be controverted, but, as will be shown, we are certainly in the realm where conflicting inferences may be drawn from the entirety of the administrative record. And those inferences must be drawn in favor of the Board's determination. (E.g., *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774, fn. 2; *Neilson v. City of California City* (2007) 146 Cal.App.4th 633, 641 [" '[T]he reviewing court must resolve reasonable doubts in favor of the administrative findings and determination.' [Citation.] . . . where conflicting inferences can be drawn from the evidence, we accept all reasonable inferences supporting the administrative findings."].)

Thus, Cities cannot merely point to evidence that supports the trial court's decision, nor can they selectively cull the administrative record for the bits and pieces that may not support the Board. Cities must go beyond that, establishing that the evidence in the administrative record is so comprehensively one-sided that the Board's

27

decision was not only against the weight of that evidence, it was a decision so lacking in support that it cannot command the assent of reasonable minds.

### The Board's Decision Is Supported by Substantial Evidence

At no point has any party disputed that taxable sales of personal property, i.e., Medline products, were being made in California by a retailer. Whether the retailer was Medline or MedCal was the central issue before the Board. How the Board resolved that issue depended upon how it would handle the issue of when title to the taxable personal property was transferred by the retailer. Determining when title passed would also determine who was the retailer.[17] Was title passed by MedCal in Ontario, as the Board concluded, or was it by Medline, as the Board's staff and appeals division concluded, or by Medline when its products were shipped from its warehouses in Fontana, Lathrop, and San Bernardino?

### Title

As previously noted, this court recently concluded that because state law did not "address when transfer of title occurs" for purposes of determining when a retail sale was "consummated" under section 7205, the Board did not exceed its authority "by using section 2401, subdivision (2), of the California Uniform Commercial Code to determine that issue." (*City of South San Francisco*, *supra*, 232 Cal.App.4th 707, 730, 728.) We repeatedly emphasized that section 7205 vests the Board with the discretion to determine when title passes, and that courts must "accord [the Board's] decision to resort to the California Uniform Commercial Code the deference it is due." We twice cited the principle that "where, as here, 'a statute leaves room for discretion, a challenger must show the official acted arbitrarily, beyond the bounds of reason or in derogation of the

---

[17] In their petition for rehearing, Cities insists that when title transferred is not near as important as who did the transferring. But this approach only begs the question of which entity held title to the goods when MedTrans put those goods on its truck for delivery of those goods to the customer. As shown in this opinion, it is that question which is required by the statutory siting of the taxable transaction at "the place of business of the retailer." (§ 7205; see § 6015, subd. (a)(1) [defining retailer].) In a sense, asking who, when or where title transfers to the customer are merely different ways of framing the same question.

28

applicable legal standards.' " (*Id*. at pp. 720, 728, 730.)  And we held the Board was not required to use California Uniform Commercial Code section 2401, meaning that in doing so the Board was not disregarding the applicable legal standard in the statutory framework governing the sales tax.  It could have chosen a different method of determining when title passed.  The method it selected did not exceed the bounds of reason, and was not "unreasonable." (*Id*. at p. 730.)  This was deference in action.

California Uniform Commercial Code section 2401 does not have a lot to say about the mechanics of determining where or when title to tangible personal property is passed by a retailer to a consumer.  It was not always so.

Prior to 1965, the problem of passing title was a fertile field of dispute.  (See, e.g., Kidd, *The Passage of Title* (1960) 14 Wyo. L.J. p. 25 ["The problem of finding the intention of the parties is extremely difficult, and has left us with a mass of confusing and conflicting cases."].)  That changed when the Uniform Commercial Code became effective in California.  In the words of a prominent commentator:  "Unlike pre-Code law in which the location of title to goods determined many important issues arising under sales contracts, the Code de-emphasizes title practically to the vanishing point. . . .  [I]n resolving the legal consequences . . . arising from the contract of sale, basically nothing depends on the location of title."  (Henson, The Law of Sales (1985) p. 89; see 4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, § 124, p. 122.)  "The application of Section 2-401 is extremely limited, . . . for virtually noting [*sic*] in Article 2 [governing sales of goods] depends on title," but the provision does retain a modest utility, in that "[r]ules for determining the location of title appear to be stated principally to fulfill a need arising occasionally under tax law or criminal law." [18]  (Henson, The Law of Sales, *supra*, at pp. 91, 89, fns. omitted.)

---

[18] To reiterate, the actual statutory language provides:  "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.  [¶]  (a)  If the contract requires or authorizes the

California Uniform Commercial Code section 2401 may have been intended to reduce the importance of title in many contexts, but it did not eliminate the concept when applying sections 6006 and 7205. There is no basis for concluding that the former statute made irrelevant the extensive body of case law devoted to the issue of passage of title, because our Supreme Court had already held that those decisions were effectively incorporated in the definition of "sale" in section 6006. (*Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645–646.) This approach continued after adoption of the Uniform Commercial Code. (See *Cedars-Sinai Medical Center v. State Bd. of Equalization* (1984) 162 Cal.App.3d 1182, 1189; *Cal-Metal Corp. v. State Bd. of Equalization* (1984) 161 Cal.App.3d 759, 764; *King. v. State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1012.)

That case law looked primarily to the intent of the contracting parties to determine when title passed, and that determination was ordinarily treated as an issue of fact. (E.g., *South S.F. Pkg. etc. Co. v. Jacobsen* (1920) 183 Cal. 131, 133–134; *Blackburn v. Drake* (1963) 211 Cal.App.2d 806, 811; *Overly Mfg. Co. v. State Board of Equal.* (1961) 191 Cal.App.2d 20, 29.) In making this determination, the Board could expand its inquiry to include "the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case." (Former Civ. Code, § 1738, subd. (2)[19]; see *Frito Co. v. State Board of Equalization* (1961) 192 Cal.App.2d 331, 340; *Diebold, Inc. v. State Board of Equal.* (1959) 168 Cal.App.2d 628, 639–640; *Hughson Con. Milk Co. v. State Board* (1937) 23 Cal.App.2d 281, 288.)

_____

seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but [¶] (b) If the contract requires delivery at destination, title passes on tender there." (Cal. U. Com. Code, § 2401, subd. (2).)

[19] This provision was part of the Uniform Sales Act, which was effective from August 1931 (Stats. 1931, ch. 1070) until it was repealed to make way for the California Uniform Commercial Code (Stats. 1963, ch. 819, § 2).

**Documents**

Traditionally, the most significant source of intent would be the written contract, if the parties made one. (See *Sakuma v. Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 315–316; *Gopcevic v. California Packing Corp.* (1923) 64 Cal.App. 132, 137.) Here, however, as the apparent consequence of switching MedCal (and other Medline divisions) to a paperless electronic billing system, there is no sale document, and thus no direct evidence of the intent of the consumers who contracted with Medline or MedCal, and no record of their past dealings.[20] There is a surfeit of other writings generated by Medline, Medline Holdings, and MedCal. Unfortunately, the documents alone leave the issue of when and where title passed to the consumer in some confusion.[21]

It may be, as Medline's top tax officer told the Board, that Medline runs a "very lean" operation (see fn. 10 and accompanying text, *ante*), but it is certainly not a tidy one

---

[20] We have not forgotten that " 'The retailer is the taxpayer, not the consumer' " in the eyes of the sales tax. (*City of South San Francisco*, *supra*, 232 Cal.App.4th 707, 713.) Even though it appears no documentation generated by consumer-initiated online purchase addresses passage of title to the consumer, it will not be pointless to ignore the consumer altogether, something we address at a later point. Cities implicitly argue that documents between Medline and its subsidiaries have little or no relevance to ascertaining the intent of the customer and the entity from which the customer purchased goods. Although such documents may have no direct bearing on the customer's state of mind, they may be probative on identifying which Medline entity was viewed within the entire Medline operation as possessing title. And if only one Medline entity had title to pass, a differing belief by the customer could hardly be dispositive, particularly within the context of the sales tax, which is far more focused on identifying the seller. As has already been noted and will be noted again, writings are hardly the alpha and omega in discerning intent. Finally, none of the documents upon which Cities place virtually total reliance speaks to any customer's intent as to when and from whom it would receive title.

[21] Cities insists there is no confusion if we focus on two specific documents emphasized by the trial court. This approach is indicative of Cities' continuing misperception of the judicial role, namely, to look at the *entirety* of the administrative record for substantial evidence which *supports* the final decision of the administrative agency. Given the precise state of the record here, each party can point to specific items in its favor. The judicial task in such a case is in effect to undertake a broad balancing with a rebuttable presumption in favor of the administrative decision. It would be a rarity if there were one or two dispositive items in a substantial administrative record. This case is not that rarity.

in terms of its administrative paper trail. This is most evident with respect to certain contractual arrangements Medline had with Medline Holdings and MedTrans prior to formation of MedCal. These arrangements are spelled out in four two-page agreements, all dated January 1, 2005, governing storage and shipment of Medline products. These agreements were the centerpiece of the trial court's documentary analysis, and the keystone for its conclusion that "it was Medline . . . that sold the goods to, and passed title to, the customers."

The most pertinent of these writings is the "Warehouse Services Agreement." In brief, it specifies that Medline will provide Medline Holdings "with general warehousing services of its finished goods and product [purchased according to the "Distribution Agreement"] . . . including . . . the preparation of product for shipment," in exchange for which Medline Holdings will pay Medline a "monthly fee of $1.28 per square foot of warehouse space" as well as "charges . . . for services rendered" to be billed "on a periodic basis." The agreement also provides that "while title to the finished goods and product will rest with [Medline Holdings], the risk of loss to such finished goods and product will rest with [Medline] while in its possession." The "Transportation Services Agreement" between Medline Holdings and MedTrans has a like provision stating "while title to the finished goods and product while being shipped will rest with [Medline Holdings], the risk of loss to such finished goods and product will rest with [MedTrans] while in its possession."

None of these four writings specifies a term for performance. However, each is scrupulous in specifying that one Medline entity will be charged for products, services, or facilities furnished to another Medline entity, and the formula for calculating compensation. None appears to have been replaced or superseded with a new agreement taking account of MedCal's formation. Had Medline been a little less "lean" and taken the trouble to prepare updated agreements, this controversy would have been greatly simplified, and perhaps even obviated.

For the trial court, the documents it examined "strongly suggest that customers thought that they were buying the products, and obtaining title, from Medline," which

32

"the customers understood . . . was the . . . entity responsible for paying sales tax." The trial court's selective examination of documents in the administrative record led it to conclude the "evidence is consistent and shows that during the relevant time period, the customers of the Medline entities thought they were receiving title from Medline." Our own examination of the entire record, with due regard for the limited nature of allowable judicial review, requires that these questions be resolved in favor of the Board's decision.

Certainly there was a mass of documentary evidence that the Medline employees who serviced customers up to 2006 were rebranded as MedCal employees as MedCal was being inserted into the existing retail network. The same evidence showed that the new MedCal sales representatives uniformly told prospective customers that they (the representatives) worked exclusively for MedCal. When existing customers communicated with a sales representative via e-mail, the response identified the sender as working for MedCal. In support of its decision, we presume the Board found this evidence credible.

Moreover, it is undisputed that when a new account was opened, the customer filled out a "Customer Credit Application and Agreement" on a form headed "**MEDCAL SALES LLC, 3350 Shelby Street, Suite 200, Ontario, CA 91764**." And it was shown that MedCal sales reps were paid on a commission basis, that is, on the basis of what they *sold*. From all this documentation, the Board argues, "a reasonable person could infer that the customers thought MedCal, not Medline, transferred title," an inference the trial court erroneously failed to draw in favor of the Board's decision.

True, there are the four "Corporate Program Agreement[s]" executed by Medline with large institutional clients. As correctly noted by the trial court, none of these agreements—governing provision of "all Medline and non-Medline brand . . . products offered for sale by Medline"—mentions MedCal. Plus, three of the four agreements were executed *after* MedCal began operations. On the other hand, the agreements affect what must be a miniscule number of customers, the overwhelming majority (98.7%) of which purchase online with the assistance of MedCal sales reps.

Perhaps most tantalizing, and enigmatic, are the "Supply Agreement[s]" executed by various customers. All have the prefatory recital that "Customer and Medline intend to establish a vendor-vendee relationship." But three of the agreements begin by stating the agreement is between the customer "and Med Cal Sales, LLC, an Illinois corporation ('Medline')," and these documents are executed by "MED CAL SALES, LLC." The fourth states that the agreement is between the customer and "Medline . . . and its wholly owned consolidating subsidiaries, MedCal Sales . . . and Medline Industries Holdings," all of which hereafter "collectively referred to as 'Medline.' " This agreement was executed on behalf of "MEDLINE INDUSTRIES." Each agreement provides that "Customer shall be responsible for the payment of all applicable sales . . . tax incurred by Medline . . . on all Products . . . provided to Customer" "[t]o the extent these taxes are applicable. One hundred percent (100%) thereof shall be added to invoices and paid in full by Customer." And all but one of these agreements also provides where notices required by the agreement are to be sent: "If for Medline, to: [¶] Med Cal Sales, LLC [¶] One Medline Place [¶] Mundelein, Illinois 60060."

The inference just quoted by the Board can be reinforced with these documents. Granted, with the exception of the "Corporate Program Agreement[s]," the status and function of MedCal is somewhat opaque. However, reading them from the perspective of *upholding* the Board's decision does add some clarity. Thus, the sales tax provisions do not expressly say that Medline will incur sales tax liability because it is the sole entity selling Medline products in California or to California customers. The "[t]o the extent these taxes are applicable" language is open to the interpretation that Medline may not automatically or necessarily incur such liability. The entirety of the agreements can be read as establishing that when they say Medline they intend to mean MedCal. Three of the supply agreements are easily read to identify MedCal as the real contracting party and the entity that will pull the laboring oar in performing the agreement, meaning also that it is MedCal that will provide the goods and receive payment from the customer for those goods. The fourth can be read to the same conclusion, because "Medline" as used in that

agreement is a collective designation that expressly includes MedCal.[22] The "Notices" provision in every one of the agreements can be read as requiring that any "communication"—including complaints, requests, or queries—is to be directed to MedCal, and only to MedCal. Even in the absence of formal novations, the Board could conclude from the supply agreements that MedCal was being inserted as a new party to the rights and obligations of the existing administrative services, warehouse services, distribution, and transportation services agreements.

Documents may be important, even dispositive, but they should not be made a litmus test. Nor should the four corners become a fetish. It is a bedrock principle of taxation that substance is more important than form. (E.g., *Microsoft Corp. v. Franchise Tax Bd., supra*, 39 Cal.4th 750, 760; *Dyanlyn Two v. County of Orange* (2015) 234 Cal.App.4th 800, 818.) To this end, the Board has the discretion to discard the literalism of writings and the terminology used by the contracting parties. (See, e.g., *Southern California Edison Co. v. State Board of Equalization* (1972) 7 Cal.3d 652, 662 ["in sales and use tax matters the language utilized by the parties to characterize their transactions does not, in itself, necessarily control"]; *Northrop Corp. v. State Bd. of Equalization* (1980) 110 Cal.App.3d 132, 139 [" '[i]n interpreting [a] transaction the taxing authority is not necessarily bound by the language the taxpayer chose to describe it or by the bookkeeping entries chosen to record it' "]; cf. *Woodbine v. Van Horn* (1946)

---

[22] In an October 2005 internal memo announcing setting up the MedCal operation, the Medline management tried to emphasize that employees of Medline, Medline Holdings, and MedCal should henceforth identify themselves with the precise name of their employer in "situations where you are entering into a formal legal document," and specifically, "If you are a member of the sales organization in CA, and thus employed by Med Cal Sales, LLC, you should use the name of Med Cal Sales LLC on any formal legal documents that you are signing." However, the memo went on to blur these distinctions in the manner suggested in the text: "In standard transaction documents and other Non-legally binding documents, in ordinary business correspondence, and in other situations, employees of each of the three entities can simply refer to their employer and their company as 'Medline.' For example, marketing materials, boxes, invoices, and purchase orders should now simply use the name Medline, as opposed to Medline Industries, Inc. or one of the other two entity names."

29 Cal.2d 95, 106–107 [contractual language "not necessarily determinative of the question as to whether the parties intended" to pass title].)

Here, contrary to Cities' reading that the writings cited by the trial court are "controlling [and] cannot be disputed or altered by extra-contractual evidence of 'internal intent,' " we conclude those documents are far from dispositive. It is therefore appropriate to widen the focus to "the conduct of the parties . . . and the circumstances of the case," which may be established by parol evidence. (*Woodbine v. Van Horn*, *supra*, 29 Cal.2d 95, 107–108; *Diebold, Inc. v. State Board of Equal.*, *supra*, 168 Cal.App.2d 628, 639–640; *So. Pac. Co. v. Hyman-Michaels Co*. (1944) 63 Cal.App.2d 757, 761.)

## Circumstantial Evidence

As already noted, at the hearing the Board was in effect told that the sole reason for creating MedCal and inserting it into the existing distribution process was to reduce the amount of sales tax that Medline, as an entire entity, would pay.[23] This parol evidence testimony was received in full conformity with the Board's rules (Cal. Code Regs., tit. 18, §§ 5523.6–5523.7, quoted at fn. 15, *ante*), and was thus entirely legitimate for the Board's consideration and reliance. The Board could also draw this conclusion from the location agreement between MedCal and Ontario, which includes the recital that "MedCal agrees to conduct its business so that the place of sale for all Taxable Sales . . . will be to [Ontario] pursuant to the Sales Tax Law" There is no evidence that Ontario, or any of the Medline entities, believed or behaved as if the administrative services, warehouse services, distribution, and transportation services agreements were ineffective in achieving the goal of moving the situs of taxable transactions to Ontario,

---

[23] In addition to the oral "testimony," the Board also had before it Kievert's declaration in which he stated: "Medline approached Ontario to discuss creating a sales office in California and requested financial assistance from the city to make this sale office a viable option. The incentive enabled Medline to move its sales operation to California. Consistent with standard Medline business procedures, a separate legal entity (MedCal Sales, LLC) was established to operate this new California sales office and to begin hiring fulltime office sales employees." There is similar evidence in the administrative record.

which would constitute circumstantial evidence that the parties to those agreements accepted them as effective in achieving the desired result. " ' "It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be . . . .' " [¶] . . . 'This was a practical construction placed upon the contract by the parties themselves, which renders it immaterial to consider what might be the literal construction of its terms.' " (*Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753–754, quoting *Mitau v. Roddan* (1906) 149 Cal.1, 14.) This may account for the Board's initial—and ultimate—acceptance of the claimed shift of taxable retail sales to Ontario, on the theory that " '[p]arties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions.' " (*Crestview Cemetery Assn. v. Dieden, supra*, at p. 754.)

In this type of situation, the "rule of practical construction" endorsed by our Supreme Court limits judicial revision of the contract: "Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean. Thus, even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation the parties by their actions have created the 'ambiguity' required to bring the rule into operation. If this were not the rule the courts would be enforcing one contract when both parties have demonstrated that they meant and intended the contract to be quite different." (*Crestview Cemetery Assn. v. Dieden, supra*, 54 Cal.2d 744, 754.) There is no reason in law or in logic why the Board could not adopt this reasoning, particularly in a situation where private parties' understanding entailed no reduction of sales taxes collected, but involved only a question of allocating those taxes.

There is more "conduct of the parties . . . and the circumstances of the case." Remember, following delivery of the ordered goods, the customer would continue to deal only with MedCal sales reps and employees. If the customer had complaints, they would be addressed to, and handled by, the same MedCal sales representative who helped place the order. Additionally, it was MedCal that the customer paid for the goods.[24] The Board could treat this as circumstantial evidence that the customer believed title to the goods was coming from MedCal. (E.g., *Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 67, 70; *Woodbine v. Van Horn*, *supra*, 29 Cal.2d 95, 107–108.)

There is more. As already noted, Medline official Gerstein explained to the Board how the order and shipping process operated to pass title from MedCal to the customer. Again, this was evidence of ponderable force. (Cal. Code Regs., tit. 18, §§ 5523.6–5523.7; *Woodbine v. Van Horn*, *supra*, 29 Cal.2d 95, 108.) And this evidence was corroborated by the declarations of Medline Director of Tax, Compliance and Audit Kievert, Medline Chief Operating Officer Abrams, and Medline Chief Financial Officer Kristofer Howard, which detailed the steps of the attached "Diagram of Sales Process." The Board also had evidence in the administrative record that the order-to-shipping process did not generate an invoice documenting each step, but successive payments at each step was evidenced by "intercompany charges for their services," an omission Gerstein acknowledged at the hearing.

The reasons for Medline's changes were explicit—and never denied. The strategic intent could not be clearer. As one member of the Board noted at the hearing, Medline

---

[24] Cities believe the manner of payment shows just the contrary, that the money was intended for Medline. They rely on the heading of the invoice the customer receives as showing that payment is due simply to Medline. However, Gerstein told the Board that collecting payment was one of the administrative services provided to all the subsidiaries. That explanation constitutes testimonial proof permitted by the Board's rules. (Cal. Code Regs., tit. 18, §§ 5523.6–5523.7; *Woodbine v. Van Horn*, *supra*, 29 Cal.2d 95, 108.) We assume the Board's double credibility assessments of "taxpayer's representatives" cover this testimony.

was simply following the celebrated observation of Learned Hand: "[T]here is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands." (*Commissioner of Internal Revenue v. Newman* (2d. Cir. 1947) 159 F.2d 848, 850–851 (dis. opn. of Hand, J.).) Medline was simply taking up Ontario's offer to halve Medline's sales tax liability if Medline redirected its affairs so that sales occurred in Ontario, and no longer in Fontana and Lathrop. The Board could also be impressed that the Internal Revenue Service was being told that all sales of Medline products in California were attributable to MedCal and its Ontario operations.[25]

To this end, Medline implemented an extensive restructuring of its operations. It interjected a new actor, and made it the employer of record for personnel formerly paid by Medline. As part of its "very lean" operating ethos (see fn. 10 and accompanying text, *ante*), Medline reflected the restructuring by integrating MedCal operations into its internal paperless accounting system, which was scrupulous in billing MedCal for goods it purchased and services it used from other Medline entities, specifically, Medline Holdings and MedTrans. Gerstein was closely questioned at the hearing about MedCal's operations, both as to coverage of the various written agreements. The Board could have disbelieved the evidence of Medline's centralized accounting practices, and the explanation of what certain entries betokened (see *Northrop Corp. v. State Bd. of Equalization*, *supra*, 110 Cal.App.3d 132, 139), but it chose instead to credit them. This is not a matter of appellate review presumptions because on both points—the sales

---

[25] Information on a taxpayer's federal returns may prove pertinent to an inquiry before the Board. (See *Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 879 ["a taxpayer's treatment of an asset on the taxpayer's federal tax returns may be a relevant consideration in an appropriate case"]; *McConville v. State Bd. of Equalization* (1978) 85 Cal.App.3d 156, 161–162 ["accountant's tax treatment" properly consulted to support inference of taxpayer's intent]; cf. *Wilson v. Brawn of California, Inc*. (2005) 132 Cal.App.4th 549, 557 ["Brawn pays California use tax, rather than sales tax, on the theory that the goods were 'sold' when they left Brawn's place of business, located outside of California. Brawn records the revenue for the goods sold at the point of shipment"].)

representatives' employer and the "journals" of the internal accounting system—the Board expressly found MedCal's proof "credible and persuasive."[26]

The Board was further advised by Howard, Medline's chief financial officer, that Medline's practice of charging subsidiaries for centralized economies of scale was indicative of a "transfer pricing" system that was compliant with "Federal tax laws" and that had become widespread.[27] Indeed, Board member Mandel stated at the hearing that

[26] The trial court was thus in error when it disregarded "documentary evidence of bookkeeping entries" as "beside the point" and "not relevant to the inquiry of what the parties to the retail transaction intended." As previously noted, the intent of the actual customer was essentially unknowable. (See fn. 20 and accompanying text, *ante*.) This is precisely why California Uniform Commercial Code section 2401 is useful. By establishing rules on title passage, subject to explicit agreement by the buyer and seller, the statute makes the absence of evidence of those parties' intent "beside the point." All that was truly germane was whether MedCal had the title to pass. If it did, as the Board concluded, it does not matter which entity the buyer thought was passing title, because only MedCal had title to the goods the buyer was purchasing. Of course, the whole problem could be avoided by including a statement about title to passage among the terms and conditions, if MedCal requires every new customer to agree to its terms and conditions, or when making an internet purchase. (Cf. *Ambers v. Beverages & More, Inc.* (2015) 236 Cal.App.4th 508, 515–516 ["When making his online purchase through BevMo's Web site, plaintiff agreed to the Web site terms and conditions of use, which state that title to purchased merchandise is transferred to the buyer at the time his or her credit card is charged"].) If MedCal already does so, it is not reflected in the "Customer Credit Application and Agreement" every new customer must complete.

[27] Howard stated in his declaration: "A privately held, multi-entity, multi-national company with rapidly growing sales and fast growing geographic territories requires less formality from its wholly owned subsidiaries, then would be required of non-related entities. Nonetheless, it must follow Federal tax laws regarding transfer pricing. Transfer prices are used when individual entities of a larger multi-entity firm are treated and measured as separately run entities. Transfer pricing rules recognize that it is common practice for a large multi-entity, multi-national, organization to establish efficient processes by streamlining back office operations under one unified umbrella. These unified costs are then shared by each legal entity throughout the organization through a transfer price (i.e., a cost allocation method) used to attribute a corporation's net profit or loss. These charges between related parties are made for goods, services, or use of property (including intangible property such as brand names). . . . The legal agreements provided by MedCal, to the Department, reflect Medline's charges to MedCal for these back office services.

"it's not a paper world anymore and hasn't been for some time." Without any demur from other members of the Board, Mandel further stated: "there's been no dispute that this [MedCal] is a real company." Howard added that staff auditors "have firsthand experience that taxpayers no longer operate through a paper environment," a statement that also went unchallenged at the hearing.

So, which entity is the "retailer" that made the "sale" that involved "transfer of title"? (§§ 6015, 6006, subd. (a).) Is it MedCal, as the Board's staff initially concluded and the Board ultimately concluded, or is it Medline, as the Board's staff and Appeals Division intermediately concluded? Given the administrative U-turns, either result could command substantial evidence from this administrative record, and neither would be compelled as a matter of law. Either result could be reached by reasonable administrators. (E.g., *Pratt v. Rosenthal*, *supra*, 181 Cal. 158, 163; *Pacific Gas & Electric Co. v. Public Utilities Com.*, *supra*, 237 Cal.App.4th 812, 839; *Sierra Club v. California Coastal Com.*, *supra*, 12 Cal.App.4th 602, 610.) This in turn puts a premium on correct appreciation and application of the judicial standard for reviewing the Board's decision.

It is for administrative agencies " ' "to weigh the preponderance of conflicting evidence" ' " before them (*Eden Hospital Dist. v. Belshe*, *supra*, 65 Cal.App.4th 908, 915–916 and decisions quoted) and to choose among conflicting inferences from that evidence. (*Neilson v. City of California City*, *supra*, 146 Cal.App.4th 633, 641.) Reviewing courts must also defer to the Board's expertise in administering the "highly technical," "intensely detailed and fact-specific sales tax system governing an enormous universe of transactions." (*Loeffler v. Target Corp.*, *supra*, 58 Cal.4th 1081, 1103.) This expertise vests the Board with the discretion to take account of " ' "administrative

---

"Additionally, larger multi-entity organizations electronically create purchase orders and sales invoices. This information is accounted for in accordance with the Federal transfer pricing rules. . . . The individuals conducting field audits . . . are keenly aware of the changes made to the electronic environment within the back office of a large multi-entity organization" and "have firsthand experience that taxpayers no longer operate through a paper environment."

consequences arising from particular interpretations" ' " of that system (*Yamaha Corp. of America v. State Bd. of Equalization* (1999) 73 Cal.App.4th 338, 353), and to decide factual questions—as opposed to issues of law—and reach a result with which a court may disagree, consider implausible, unreasonable, or even believe is just plain wrong. (E.g., *Marcucci v. Board of Equalization*, *supra*, 138 Cal.App.2d 605, 609; *Hansen v. State Board of Equalization*, *supra*, 43 Cal.App.2d 176, 179–180.)  In short, concerning this issue, judicial deference to an adjudicatory administrative outcome should be approaching its zenith.

The Board could reasonably conclude that Medline was sufficiently sophisticated to know how to shift sales situs operations to satisfy section 6006's definition of a sale.  It is reasonable to assume that the practice of luring retailers to change location, a practice so prevalent it was substantially restricted by the Legislature (see fn. 6, *ante*), was familiar to the Board.  It is equally reasonable to assume that the Board had seen a number of relocations that were motivated by concerns of reducing the amount of sales tax a given retailer would actually pay, and, following the bedrock principle of taxation that substance is more important than form (e.g., *Microsoft Corp. v. Franchise Tax Bd.*, *supra*, 39 Cal.4th 750, 760), it could differentiate between the bogus and the bona fide. In short, when it comes to identifying the retailer passing title to a customer, the Board knows one when it sees one.

Our careful review of the administrative record establishes that there is ample evidence, direct, documentary, and circumstantial, to support the Board's determinations that (1) customers believed they were ordering goods from MedCal; (2) MedCal became the retailer when it purchased goods from Medline for shipment to MedCal's customer; and (3) when MedCal then paid MedTrans to deliver those goods to the customer, MedCal "complete[d] . . . performance with reference to the physical delivery of the goods." (Cal. U. Com. Code, § 2401, subd. (2).)  And did so in Ontario.[28]

---

[28] In light of the conclusion, we summarily reject as moot Cities' arguments (1) that because "none of the local sales tax revenues at issue could be allocated to Ontario," they "should be allocated to Fontana, Lathrop, or San Bernardino."  "On remand, the

42

**DISPOSITION**

The judgment is reversed, and the cause is remanded to the trial court with directions to enter a judgment denying the petition.  The Board, the City of Ontario, MedCal Sales, LLC, and Medline Industries, Inc., shall recover their respective costs of appeal.

---

BOE should be ordered to perform a simple accounting to confirm which distribution center participated in each of the sales," and (2) that this "reallocation . . . should be made retroactively to 2006, when the misallocation started."

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Miller, J.


A147642; *City of Fontana et al. v. California Dept. of Tax & Fee Administration*

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Evelio M. Grillo

Counsel:

Wendel, Rosen, Black & Dean, Leslie Allen Hausrath, Kevin R. Brodehl for Plaintiffs and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Diane S. Shaw, Assistant Attorney General, Anne Michelle Burr and Heather Brae Hoesterey, Deputy Attorneys General for Defendant and Appellant.

Holland & Knight, Charles L. Coleman III, David I. Holtzman for Real Parties in Interest and Appellants.